Promptly after the final hearing of this cause I filed an ungarnished memorandum in which I announced: "I have given the cause studious consideration, and I have definitely resolved that the counter-claim accompanying the answer of the defendant should be dismissed, and a decree advised in favor of the complainant."
Mr. Irving Reichenthal, who conducts his business activities through the corporate instrumentality known as Irving Metals Company, has chosen to prosecute an appeal which, in view of the decree, is, of course, the right of his company regardless of the activating motive. Hence, in obedience to *Page 422 
the constitutional mandate as yet effective I am obliged to acquaint the appellate tribunal with the reasons for my conclusions.
Having been privileged to hear the testimony in the tone and manner in which it was delivered, to observe the courtroom demeanor of the principal witnesses, and particularly to behold the cupidity of Mr. Reichenthal, so arbitrarily and indeed boldly exhibited throughout the entire litigation, I shall undertake to relate the story of the case.
The complainant, Moss Industries, Inc., may be described as a family corporation which has been engaged for approximately a century in the business of manufacturing metal products. The company survived the difficult conditions of the last economic depression. In November, 1946, it became the victim of a so-called jurisdictional labor strike, followed by a more devastating misfortune in February, 1947, in the death of its experienced president.
The deceased president's son, George S. Moss, who was then being educated for admission to the legal profession, succeeded as president of the company and in association with his uncles undertook the management of the business. Parenthetically, I may remark that the young man is noticeably well educated and intelligent, but I conjecture that he had not yet learned from experience or otherwise that there are wolves in the fields of metropolitan business as well as in the woods.
He did, however, soon discover that while the company had valuable assets, the cessation of its manufacturing operations was rapidly creating a shortage of cash. The credit position of the company with the Corn Exchange Bank and Trust Company of New York, Fulton Street Branch, was sufficiently favorable to cause its manager to indulge occasional overdrafts which in the initial stages of that practice were customarily adjusted without alarming delay. The ability of the company to meet overdrafts gradually became more intensely difficult. The ultimate anxiety of the bank manager concerning the payment of remaining overdrafts is a circumstance which threadlike passes through the fabric of this controversy. *Page 423 
Among the unencumbered assets of the complainant company was a large quantity of so-called new metals, such as etching brass, stainless steel, nickel silver, all in original unopened cases. At that time the company was paying 50c and 55c a pound for nickel silver, 40c a pound for aluminum, 40c a pound for stainless steel, and 38c a pound for brass. It had in excess of 200,000 pounds of such metals in its warehouse of an aggregate value probably in excess of $70,000. The metals were marketable but, as Mr. Moss describes them, they constituted the "life stream" of the manufacturing operations hopefully to be soon resumed by the company.
The unsatisfied overdrafts, as I recall the evidence, amounted at the time to approximately $12,000, and the bank manager recommended, more likely insisted, that Moss sell some of the metals or, alternatively, utilize them as collateral security for a loan sufficient in amount to pay the overdrafts and to provide some surplus to alleviate the existing painful shortage of liquid resources.
It was in that exigency that the bank manager introduced young Moss to Mr. Reichenthal, a dealer in scrap metals, with money to loan upon a practical and businesslike basis. I heretofore digressed to impart some characterization of Moss. To avoid impartiality in the descriptive lines of my narrative, I pause to present Reichenthal as a shrewd and crafty bargainer who is not likely to be caught in any business transaction with nothing but chaff in his hands.
These gentlemen conferred on May 28th, 1947, and a handwritten memorandum of the terms of their agreement with a copy was prepared. It reads:
"This agreement made 28th day of May 1947 between Irving Metal Co. Inc., Rahway, N.J. Moss Industries Inc. of 113-53 St. Bklyn. Irving Metal Co. Inc. agrees to advance 12c per lb. for brass, Irving Metal Co. to truck said metal both ways. The metal to be kept in storage by Irving Metal Co. Inc. for a period not exceeding one year, permitting Moss Co. to take any and all metal which has been delivered, the Moss Co. to pay 14c per lb. for said metal received by them. There is to be no other charge. Any quantity less than 1000 lb. taken by Moss must be trucked by Moss. This is not a sale but an advance. If Moss fails to take metal back in one year, Irving Metal Co. will retain title. The amount involved not to exceed 200,000 lb." *Page 424 
The memorandum which at the very least is indicatory of the footprints of the parties was signed on behalf of the complainant company by Moss as president, but Mr. Reichenthal had unfortunately neglected to have his eye glasses with him (it seems to me I have heard this alleged absolution before), and furthermore he announced that he expected to meet at cards in his club that evening a friend who was an attorney to whose scrutiny he preferred to submit the proposed agreement — an unremunerative imposition so well known to our profession. But let me begin here to season this report of the case with a few quotations from the testimony. Direct examination: "Mr. Reichenthal, when you and these gentlemen were discussing this metal, was there anything said by you to lead them to believe that you were going to loan them any money?" Answer: "I should loan them money?" "Yes." "For what?" "On the metals." * * * "Was there anything said by anyone about loaning them money on the material?" "Loaning them, no." Counsel persevered: "There is in there (the memorandum) some phraseology with regard to them having the right to redeem these materials within a period of a year." "Yes." "Was that ever discussed and agreed to by you?" "Not that I know of." "Do you know?" "No." "It wasn't agreed to by you?" "Not that I know of." Cross-examination: "And this paper sets forth what you talked about. Is that right?" "That's right."
It has been said that some men have two reasons for doing anything — a good reason and the real reason. Their actions, however, often unmask the latter. On the day following the conference to which I have just referred, Reichenthal visited the complainant's plant in Brooklyn and inspected the stock of metals. I fancy that his palms then began to itch. His trucks soon arrived and the physical removal of the metals from the complainant's plant in Brooklyn to the defendant's storehouse in Woodbridge Township, Middlesex County, New Jersey, began. So prompt an arrival of the defendant's trucks seems to exemplify the occurrence of a miracle. "Now, Mr. Reichenthal, did you authorize the sending of any of your trucks and truck drivers to the plant of the Moss Industries *Page 425 
to pick up any materials?" "No, sir." "You didn't do that?" "No, sir."
Notwithstanding the unprecedented fortuity to which I have last alluded, it is the acknowledged fact that between May 29th, 1947, and June 10th, 1947, inclusive, 208,000 pounds of the metals were transported by the defendant's vehicles to its storehouse in Woodbridge Township. The shipping receipts are in evidence, of which the following is a typical specimen:
"The above material is delivered to you in accordance with our arrangement as follows:
"This is not a sale, title does not pass, and transaction merely represents an advancement. You are to advance us twelve (12c) cents a pound for this material and you will store same for us in your warehouse at Rahway, New Jersey. You are to deliver any part of this material to us upon our request. You will receive from us fourteen (14c) cents per pound for the material we request returned to us. If we request less than one thousand (1000) pounds, we will make our own pick-up, however, if more than one thousand (1000) pounds is requested by us, you will deliver to us. There are no charges other than the two (2c) cents per pound which covers trucking, warehousing and financing.
"This arrangement is to be in effect for one year and any material which has not been returned to us within this period of time is subject to your disposal.
 "IRVING METAL COMPANY, INC. "D. LAYFIELD."
The similarity between the terms of the memorandum of May 28th, 1947, and of the shipping receipts is at once perceptible. Yet Reichenthal declares that those in his employ who signed the receipts did so without his authority and that the tons of metals shifted into his possession in the absence of any mutual understanding and agreement whatever.
At this junction a novelist would inject a chapter revelational of the anguish, wretchedness and despair of the bank manager. Moss was expeditiously surrendering the metals, but Reichenthal was not extruding any money. The accursed overdrafts were plaguing the banker each day with increasing intensity and had already become a gnawing menace to his situation. Yes, Reichenthal too was a customer of the bank, and Moss implored the bank manager to apply some pressure *Page 426 
upon Reichenthal. O tempora, O mores! The bank manager was mindful that he had for some period of the past occupied free of cost a residence owned by one of Reichenthal's corporations. What a pity!
Having already captured the possession of more than 100,000 pounds of the metals, Reichenthal informed Moss: "No, I have changed my mind. I want to be absolutely safe. I only want to advance you 10c a pound on the material." Moreover, said Reichenthal, "I want a penny a pound for handling the material and keeping it in my warehouse * * *." Moss inquired, "Mr. Reichenthal, give me a breakdown of how you arrive at that cost." The reply, "No, I can't give you any breakdown. That's what it is and that's all there is to it." A reversion of the possession of the metals was intimated: "Mr. Reichenthal, I may as well take my metals out." "It's going to cost you a penny a pound." "It's going to cost me a penny a pound if I take my material out?" "That's it." Moss was now receiving his initial introduction to the sharp edge of a pragmatical trading wedge.
The state of case will portray the dramatic scene of the conference of June 4th, 1947, between the financially indefensible Moss and the omnipotent Reichenthal, from which the following agreement eventually emerged:
"126743 lbs. of metal consisting 12c per lb. $15209.16
 of brass and other
 metals including cases
 in which material is
 packed.

"This invoice does not constitute a sale, but an advance in which the title to the material does not pass.
"Moss Industries, Inc. is invoicing this material for 12c per lb. on which Irving Metal Co., Inc. is to advance Moss Industries, Inc. 10c per lb. Moss Industries, Inc. is to take back and pick up the material in whole or part within 60 days from date and pay Irving Metal Co., Inc. back the net sum of 10c per lb. Irving Metal Co., Inc., at that time, is to bill the material at 12c per lb. and simultaneously issue a credit of 2c per lb. to Moss Industries, Inc. for every pound of material removed. Moss Industries, Inc. is to issue a credit of 2c per lb. to Irving Metal Co., Inc. for every lb. of material removed. "In the event that Moss Industries, Inc. does not remove the material within 60 days from date, title passes to Irving Metal Co., Inc. and Irving Metal Co., Inc. is the sole owner of this material. *Page 427 
"Moss Industries is to pay Irving Metal Co., Inc. the sum of 1/4c per lb. for each lb. of material removed, such sum representing all charges.
"At the time of pick up, Moss Industries, Inc. is to issue to Irving Metal Co., Inc. a certified check covering the material removed.
"This invoice and agreement cancels all shipping documents and previous arrangements between Moss Industries, Inc. and Irving Metal Co., Inc. and the shipping receipts are to be used only for the purpose of identifying the material as to the quantity and the weight thereof. "The Irving Metal Co., Inc. does not assume any responsibility of fire, theft, losses or damages to the said material.
 "MOSS INDUSTRIES, INC. "GEORGE S. MOSS. "IRVING METAL CO. INC. BY IRVING REICHENTHAL, Pres."
Although the complainant was evidently entitled to receive a loan of $15,209.16 on June 4th, 1947, Reichenthal continued to procrastinate. On June 9th, 1947, having gathered almost all of the metals, Reichenthal transmitted $12,630.30 to the bank to the credit of the complainant, and successive payments made on June 10th and 11th, 1947, comprised the loan of $20,820.10.
Moss, however, was destined to experience another disillusion. Experience is one thing in life that you cannot ordinarily acquire for nothing. When he appeared with $2,000 in cash with which to redeem a required portion of the metals, he discovered that Reichenthal was again graceless and intractable. Nothing doing.
With some premonition of future quagmires likely to be encountered in his relations with Reichenthal, his visionary benefactor, Moss initiated negotiations elsewhere for a loan which would enable him to redeem from Reichenthal his collateral security within the allotted period of sixty days. He obtained the desired loan from the Greater New York Savings Bank in Brooklyn and informed Reichenthal of his accomplishment. How often in the eleventh hour of an emergency is the anticipated rescue just a trifle unpunctual. The loan was granted but the proceeds would not be available on August 4th, 1947. Reichenthal forthwith bathed Moss with sedative assurances that a strict and rigorous exercise of the right of redemption was not required and that incidentally he had planned a recreational visit at Atlantic City. *Page 428 
However, on August 4th, 1947, Reichenthal accompanied by his attorney adventitiously overtook Moss at the bank. Let us listen to a fragment of the conversation: Reichenthal to his attorney, "I want you here." "I want you to read this" (as if he had not already examined the memorandum of June 4th, 1947). Reichenthal, "Does it [the stock of metals] belong to me?" The attorney, "According to this, if Moss didn't pay you, the material belongs to you." Reichenthal, "That's all I want to know. I want a certified check for $22,000 now."
I turn now to the direct examination of Reichenthal at the final hearing, in which his counsel sought to elicit the inclinations of the witness at the time of the asserted forfeiture. Counsel, "And you would have given them the material?" "Oh, yes, I was anxious to unload." "You wanted to do it?" "Yes." (See letter of attorney to complainant dated August 4th, 1947 — Exhibit C-13.) "What, if anything, did you do after that with regard to the disposition of this metal?" "I don't know." "You made a commitment to sell it, didn't you?" "Then, naturally I sold it." It was on the first day of the trial that counsel for the defendant stated: "We admit we have all the materials." His client seems to have been inattentive at the moment of that remark.
It is to be recalled that Reichenthal did not complete his 60-day loan until June 11th, 1947. On August 7th, 1947, the complainant forwarded to the defendant its certified check for $20,000 with assurances of its ability and willingness to pay the excess to be computed. Under date of August 12th, 1947, the attorney acting for Reichenthal rejected the check and notified the complainant that "the position that my client took in this matter, as set forth in my letter of August 4th, 1947, sent to you by registered mail (viz., the forfeiture of ownership of the metals) remains unchanged. (Parenthetical insertion mine.)
I need only add that the complainant immediately thereafter tendered to the defendant the full amount of the loan, renewed the tender upon an application for relief pendente lite (Vide,140 N.J. Eq. 484; 55 Atl. Rep. 2d 30) and deposited the amount due with the clerk of this court in pursuance *Page 429 
of the terms of the final decree. The nimble trick which this defendant is endeavoring to execute is to exchange $22,902.10 in cash for $70,000 worth of marketable materials, first under the pretense that the transaction was a sale. Humbug! The memorandum to which Reichenthal subscribed his signature on June 4th, 1947, reports: "This invoice does not constitute a sale, but an advance in which the title to the material does not pass." * * * "The Irving Metal Co., Inc., does not assume any responsibility of fire, theft, losses or damages to the said material." Secondly, the defendant proposes that the pledge agreement itself operated to transmit the title of the material to it upon the failure of the complainant to redeem within the specified period of sixty days.
This latter proposition defies the settled law of our State. The right of redemption cannot, without offending the public policy of our State, be surrendered by the terms of an original contract of pledge. It has been held that a contract between a pledgor and pledgee of the nature of the instant agreement is void on grounds of public policy and inoperative to terminate the equity of redemption. Endicott v. Marvel, 81 N.J. Eq. 378;87 Atl. Rep. 230; affirmed, 83 N.J. Eq. 632; 92 Atl. Rep. 373.
See, also, 85 N.J. Eq. 52; 95 Atl. Rep. 361.
Courts of equity have always been free to apply the principles of morality, fairness, and justice to any given case. Among its utilitarian duties is its obligation to guard and preserve equities of redemption against lustful and unconscionable confiscations by a money lender from the normally meager resources of the debtor.
In a catenation of circumstances and events such as those distinctly revealed in this cause, equity jurisprudence afforded no choice other than a decree for the complainant. *Page 430