SINCLAIR REFINING COMPANY, Complainant-Appellant, v. MRS. LULA MAY MARTIN and husband, D. D. MARTIN, Defendants-Appellees.—270 S. W. (2d) 576.

Middle Section. April 29, 1954.

Petition for Certiorari denied by Supreme Court, July 23, 1954.

Bass, Berry & Sims, of Nashville, for appellant.

M. S. Ross, and Stockell, Rutherford & Crockett, of Nashville, for appellees.

HICKERSON, J. Sinclair Refining Company, here called Sinclair, brought this suit against Mrs. Lula May Martin and husband, D. D. Martin, to enforce specific performance of an option to purchase a service station and lot on Gallatin Road, Davidson County, Tennessee, fully described in the bill.

By answer, defendants set up the defenses that: (1) the lease, which contained the option to purchase, was

signed by Mrs. Lula May Martin, in whom title to the land was vested, without knowing that the option to purchase clause was in the lease contract; (2) her signature was procured to this contract in a fraudulent and unfair manner; (3) the purchase option was put into the lease contract by mistake or misunderstanding, and it would be inequitable and unfair to enforce specific performance of the purchase option; and (4) the sale of the service station and lot would be very detrimental to the trailer court on other land of defendants adjacent to the service station lot and great damage would be done to the value of this remaining property of defendants.

By cross bill, defendants sought a decree adjudging that they were, "entitled to the ownership and possession of the property described in the bill, and that the same has been unlawfully appropriated by the complainant, Sinclair Refining Company"; and they prayed that, "cross complainants have and recover of the Sinclair Refining Company a judgment for the reasonable use and occupancy of their property unlawfully appropriated by Sinclair Refining Company to its own uses."

The Chancellor decreed, as follows:

"1. The prayer for specific performance of the lease provisions for the conveyance of the property described in the original bill is denied.

"2. The cross bill of the defendants is sustained to the extent that possession of the premises described in the pleadings, now held by the complainant, is hereby decreed to the defendant, Mrs. Lula May Martin.

"3. This cause is referred to the Clerk and Master, who will, from the proof on file and such additional proof as may be adduced by the parties,

determine and report to the Court what, it any, damages have resulted to the complainant by reason of defendants' failure to make the conveyance prayed for in the original bill, and what is the reasonable rental value for the use and occupation of the premises during the occupancy thereof by the complainant since the termination of the lease described in the pleadings. The Master will further report any other debits or credits which should be allowed in favor of or against the complainant or the defendants to the end that an accounting may be had between them.

''Until the incoming of the report all other matters are reserved.''

To review that decree complainant and defendants appealed to this Court.

The following facts are established: On October 24, 1934, defendant, Mrs. Lula May Martin, purchased a house and lot fronting one hundred seventy feet three inches on the east side of Gallatin Road in Davidson County, Tennessee, and running back eastwardly two hundred forty-three feet three inches. Adjacent to this lot of land and on the north side of it, there is located a lot of land owned by a Mr. Smith fronting thirty-four feet on Gallatin Road and running back along East Delmas Avenue two hundred forty-three feet three inches. At a later date, Mrs. Lula May Martin bought a lot of land fronting forty-five feet on East Delmas Avenue and running south two hundred forty-three feet three inches. This lot of land extends across the east side of the Smith lot and the Martin lot.

On July 13, 1936, D. D. Martin and Mrs. Lula May Martin executed an option to lease a lot of land to Sinclair

located in the southwest corner of the large lot above described and fronting one hundred feet on Gallatin Road and running back seventy feet. Section 6 of this option to lease provides:

"That Sinclair shall have the exclusive right and option to purchase the leased premises including all, if any, of the undersigned's improvements and property thereon, whether real, personal, or mixed, free and clear of all liens and encumbrances for the sum of Twelve Thousand and no/100 ($12,000.00) Dollars at any time during the term of said lease."

Sinclair and Mrs. Lula May Martin entered into a lease contract for this lot on August 7, 1936, pursuant to the provisions of the option to lease. This lease contract provides:

"For the considerations herein named, Lessor gives and grants to Lessee the exclusive option and privilege of extending the term of this lease for five (5) years, beginning at the expiration of the original term hereof, provided Lessee shall notify Lessor of Lessee's exercise of such option not less than sixty (60) days before the expiration of the original term. Upon the giving of such notice, this lease shall be extended, and shall continue in full force and effect, with all of the agreements, obligations, conditions, and covenants herein set forth, for and during said extended term of years; and the execution by the parties of a new lease or an instrument of any kind, extending the term of this lease in accordance with such notice, shall not be required.

"For the considerations herein named, Lessor hereby gives and grants to Lessee the exclusive option and privilege of purchasing the leased premises,

including all, if any, of Lessor's improvements and property thereon, whether real, personal or mixed, free and clear of all liens and encumbrances, for the sum of Twelve Thousand and 00/100 ($12,000.00) Dollars in cash, at any time during the granted term of this lease or any extension thereof; provided Lessee shall give Lessor not less than Thirty (30) days' notice of Lessee's election to exercise this purchase option. Upon Lessee's giving such notice, Lessor shall comply with the requirements of the second succeeding Article, entitled, 'Conveyance Requirements'.

"In the event Lessor shall receive from a third party at any time during the term of this lease a bona fide offer to purchase the leased premises at a specified price, whether such price be first fixed by Lessor or the third party, the Lessor shall decide to sell the same for such amount, Lessor shall promptly give to Lessee notice of the terms of such offer and of Lessor's willingness to sell for the price offered, and Lessee shall have the first refusal and privilege (which will hereafter be referred to as an 'option') of purchasing said premises at such a price; such option to be exercised within ten (10) days after Lessee receives notice from Lessor, by Lessee's notifying Lessor that it will purchase said premises for the amount specified in said offer. In the event Lessee shall not give Lessor notice, within said ten-day period, of its election to purchase for the amount specified in said offer, Lessee shall not be obligated to purchase, and Lessor may thereafter sell said premises to the party making the offer; subject, however, to this lease and to the leasehold

estate herein granted, and to the extension and/or additional purchase options, if any, herein granted to Lessee. If for any reason said premises are not sold to such party, notice of any subsequent bona fide offers, acceptable to Lessor, shall be given to Lessee upon the same terms and conditions for acceptance or rejection as hereinabove provided.

"If Lessee shall elect to purchase said premises under the option hereby granted, Lessor shall comply with the requirements of the next succeeding Article.

"The giving by Lessee of notice of the exercise of any purchase option hereinbefore granted, shall fix or determine the right of Lessee to purchase the property included in the option which Lessee elects to exercise, and the obligation of Lessor to sell the same. Lessor shall furnish, free of expense to Lessee, within fifteen (15) days after the receipt of said notice, a complete Abstract of Title certified from title in the Government, Title Statement, or Title Guarantee Policy prepared and issued by a financially responsible title abstract company, or a Title Certificate commonly referred to as a 'Torrens Certificate of Title', showing good merchantable title in Lessor as of a date not earlier than the date of said notice. A reasonable time will be allowed Lessee to examine such abstract or other evidence of title, and if the same does not then show good merchantable title in Lessor, a reasonable time will be allowed Lessor to cure defects and clear the title preparatory to delivery of deed and any other instruments required to effect the transfer and conveyance.

"Upon acceptance by Lessee of said title, and pay-

ment to Lessor of the purchase price herein specified, Lessor shall convey to Lessee or its nominee, by General Warranty Deed, a fee simple title in and to said real estate and the appurtenances thereunto belonging, free and clear of all liens, encumbrances, and charges of whatsoever character, with release of dower, curtesy, homestead, and all statutory rights; and shall also deliver to Lessee, free of expense to Lessee, such abstract or other evidence of title, showing good merchantable title to said premises in Lessor at the time of delivery of deed.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"This lease shall not be binding upon Lessee until signed on its behalf by its President or a Vice President. All proposals, negotiations, and representations with reference to the matters covered by this lease are merged in this instrument, and no amendment or modification hereof shall be valid unless evidenced by a writing signed by such officer."

By separate written agreement dated September 26, 1936, this lease contract became effective September 19, 1936.

At the end of the first lease period of ten years, the lease contract was extended for another five years pursuant to the provisions of Article XIII of the original lease contract.

By written notice dated August 15, 1951, Sinclair exercised its option to purchase this lot and service station and made formal demand upon Mrs. Lula May Martin to furnish an abstract of title and warranty deed to the property to Sinclair pursuant to the provisions of the lease contract. Defendant refused and this suit resulted.

Mrs. Martin was a woman of limited education. Neither she nor her husband wanted to sell the lot upon which the service station was located. At the time the lease contract was executed the lot was just a vacant unimproved lot. The rest of the large lot owned by Mrs. Martin was, also, unimproved, except the residence of Mr. and Mrs. Martin was located on the lot. Since the execution of the lease, the Martins have developed a valuable trailer court on the remainder of their land which is adjacent to the service station. This trailer court is reached from Gallatin Road by driveways located on the north side and on the south side of the service station lot. If these driveways were closed by sale of the service station, the value of the trailer court would be destroyed to a great extent. To use the trailer court, in such event, it would be necessary to go to East Delmas Avenue, then follow it to the east side of the trailer court and enter the trailer court from the rear. Under these conditions it would be difficult to secure tenants or occupants for the trailer court.

The oral negotiations leading to the lease contract did not cause Mr. and Mrs. Martin to suspect that Sinclair intended to put an outright option to purchase into the written contract. The purchase refusal provision of the lease contract was discussed, and defendants understood it would go into the written lease. The purchase option provision was not discussed in the oral negotiations. Defendants did not read the written lease which covered fourteen pages. They did not actually know that the purchase option provision was in the written lease which Mrs. Martin executed. Of course, it was their legal duty to know what was in the written lease; but our inquiry here goes beyond the legality of

the lease. We are concerned with the equities. If Mrs. Martin did not know that the purchase option provision was in the lease—and we have concurred in the conclusion of the Chancellor that she did not know that it was in the lease—the representatives of Sinclair who actually handled the matter knew that Mrs. Martin did not know that the purchase option provision was in the lease. It is true that these representatives of Sinclair had no authority to ultimately bind Sinclair in regard to this lease; and it is also true that the lease provides: "This lease shall not be binding upon Lessee until signed on its behalf by its President or a Vice President. All proposals, negotiations, and representations with reference to the matters covered by this lease are merged in this instrument, and no amendment or modification hereof shall be valid unless evidenced by a writing signed by such officer." But, again, this fact goes to the legality of the lease contract and not to the equities relating to it. Mr. B. C. Clouse, the representative of Sinclair who initiated the negotiations relating to the lease and who signed the lease contract as a witness to the signature of Mrs. Martin, did not know that the purchase option provision was in the lease and was surprised when he learned that this provision was in the lease. Mr. Clouse testified that he knew the Martins did not want to sell their lot; and, if he had known that the purchase option provision was in the lease, he would have specifically called the attention of Mrs. Martin to this provision before she signed the contract because he knew she did not want to sell her lot.

The Martins constructed the service station so as to use the water and sewerage facilities which were necessary in connection with the service station jointly with

those facilities which were used in connection with the rest of their property.

The ultimate facts are these: Defendants did not know the purchase option provision was in the lease contract. Representatives of Sinclair knew that defendants did not read the lease contract. Defendants built the service station and developed the property in a manner which showed they had no intention of selling the service station to Sinclair. The representative of Sinclair, who signed the lease as a witness to the signature of Mrs. Martin, did not know the purchase option provision was in the lease and expressed surprise when he learned that fact. The service station is an important part of the balance of the Martin property. A valuable trailer court on the rest of the property, developed after the execution of the lease contract, would be seriously damaged and almost destroyed if defendants were compelled to sell this service station to Sinclair.

■ Under these established facts the damage to defendants, if they were compelled to sell the service station lot, would be far greater than the difference between the contract price of $12,000 and the actual value of the service station lot. The equities of the entire situation favor defendants. The Chancellor correctly denied specific performance. Certainly we cannot say he abused his discretion when he refused to decree specific performance in this case. Johnson v. Browder, 185 Tenn. 601, 207 S. W. (2d) 1; Parsons v. Hall, 184 Tenn. 363, 199 S. W. (2d) 99; McCarty v. Kyle, 44 Tenn. 348; Cocke v. Evans' Heirs, 17 Tenn. 287; Saunders v. Davis, 31 Tenn. App. 674, 220 S. W. (2d) 883.

In McCarty v. Kyle, supra, and Cocke v. Evans' Heirs, supra, our Supreme Court stated this rule:

"A specific performance of a contract will not be decreed, when it is hard or unreasonable in itself, or when, from material change of circumstances since the contract, the performance would be attended with any particular hardship: Perkins v. Wright, 3 Har. & McH., Md., 324."

The development of the trailer court since the contract was signed and the value of the service station lot to the trailer court would prevent a decree for specific performance in this case.

There was no actual fraud on the part of Sinclair or its agents; nor was there a mutual mistake of fact in the execution of the lease contract. The officers of Sinclair who were authorized to execute the lease put the purchase option in it just like they intended to do. The misunderstanding arose because defendants failed to read the lease. We agree with this conclusion of the Chancellor:

"On the other hand, the contract is valid, and the defendant, Mrs. Martin, cannot escape the force and effect of its terms simply because she did not exercise due care in acquainting herself with its provisions before she signed it."

In Beasley v. Metropolitan Life Insurance Co., 190 Tenn. 227, 229 S. W. (2d) 146, 148, our Supreme Court quoted from cited authorities, as follows:

" 'To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.' 12 Am. Jur., 629. 'In this connection it has been said that one is under a duty to learn the

contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.' 17 C. J. S., Contracts, Sec. 137, pages 489, 490.

" 'It will not do, for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law.' Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Berry v. Planters Bank, 3 Tenn. Ch. 69; Lockhart v. Moore, 25 Tenn. App. 456, 466, 159 S. W. (2d) 438; Federal Land Bank of Louisville v. Robertson, 20 Tenn. App. 58, 63, 95 S. W. (2d) 317.''

■ The contract in the case on trial is valid. Its provisions are plain, simple, and unambiguous. For the reasons stated herein specific performance should not be decreed. That does not mean that complainant cannot have its remedy for breach of the contract by defendant. Its remedy is an action for damages. The Chancellor properly referred the cause to the Master to ascertain such damage, if any.

All assignments are overruled. The decree of the Chancery Court is in all things affirmed. Remand to the Chancery Court to enforce it and for such further proceedings as may to the Chancellor seem necessary and proper.

The costs of the appeal will be taxed equally against plaintiff and defendants and the sureties on their respective appeal bonds. The costs in the Chancery Court will be decreed by the Chancellor upon the final decree there.

Felts, J., concurs.