202 So.2d 181 (1967)
John D. MacARTHUR, Petitioner,
v.
NORTH PALM BEACH UTILITIES, INC., a Florida Corporation et al., Respondents.
No. 35677.
Supreme Court of Florida.
July 26, 1967.
Rehearing Denied October 2, 1967.
*183 Fisher, Prior, Pruitt & Schulle, West Palm Beach, and Sam Daniels, Miami, for petitioner.
Alley, Maass, Rogers, Lindsay & Chauncey, Palm Beach, and Bedell, Bedell, Dittmar & Smith, Jacksonville, for respondents.
ROBERTS, Justice.
By conflict certiorari we review a decision of the District Court of Appeal, Fourth District, affirming a decree of the chancellor below which denied a decree of specific performance to the plaintiff, the petitioner here. The District Court set forth the history and facts in the following language: 
"The appellant, MacArthur, has perfected his appeal from an adverse decree entered in his suit for specific performance of an option to purchase executed by defendant, North Palm Beach, Inc., whose name was later changed to North Palm Beach Utilities, Inc. The subject matter of the option is a water supply and sewerage disposal system. The option is contained in a utility agreement entered into between MacArthur and defendant, North Palm Beach, Inc., on June 22, 1955, whereby MacArthur agreed to loan said defendant certain money over a specified period of time to be used to pay the costs of constructing a water supply and sewerage disposal system. The agreement provided that the loans would be evidenced by notes given by North Palm Beach, Inc., to MacArthur and would be secured by a first mortgage upon the property upon which said system was located and upon all distribution facilities, franchises, rights-of-way and easements pertaining to said systems. The utility agreement was a part of an over-all transaction whereby large acreage was sold by MacArthur to North Palm Beach, Inc., under a purchase and sale agreement, likewise of date June 22, 1955.

"The option, set forth in the utility agreement, purported to give to MacArthur the privilege of purchasing `the water supply and sewer disposal water system including all mains from North Palm Beach at the cost to North Palm Beach.' The agreement then specified the items that would determine such cost and provided that MacArthur could exercise his right to purchase at any time from June 30, 1960 (being the due date of the first note), to any time prior to the full payment of any sum due under the agreement. The option further provided that, if North Palm Beach should elect to prepay said loan, MacArthur would have six months' written notice of such intention to make prepayment and that during said time MacArthur could exercise said option to purchase. Before the loan was paid in full MacArthur attempted to exercise the option.

"The option was a part of the utility security agreement and was not supported by any independent consideration." (Emphasis added.) 187 So.2d 681.
The cases cited by the District Court do not apply to the facts in this case. Here was a complex business transaction, not uncommon to the financial community, where a seller agreed to (1) sell a large tract of land for a subdivision, and (2) to finance a water and sewerage disposal system. As a part of the overall transaction, he received an option from the purchasers to purchase the water and sewer system for its construction cost, which obviously was a minor part of the entire deal. He performed his part of the contract, but when he called upon the purchasers to sell the water and sewer *184 system back to him, they reneged. This court is committed to the proposition that A can sell a tract of land to B and reserve an option to re-purchase a part of it. See Rosenthal v. Le May (Fla.) 72 So.2d 289, 44 A.L.R.2d 336, and Blair v. Kingsley (Fla. App.2d Dist.), 128 So.2d 889.
The Rosenthal case involved a transaction where the seller sold an interest in land and reserved an option to re-purchase. The option was upheld. The Blair case involved the sale of a tract of land reserving an option of refusal for twelve years. The option was upheld.
Thus, if MacArthur had sold the land and reserved an option to re-purchase, but had not made the accommodation loan to finance the construction, there would be no doubt under the foregoing decisions that his option would be good; or if he had sold the land, and arranged for a bank to finance the construction, there would be no doubt, although the result to the purchasers would be exactly the same. Then, where is the logic that, merely because he held the mortgage, his option would be unenforceable? Is he to be penalized for accommodating the purchasers? I think not. This is not to be confused with a typical debtor-creditor relationship, which was in general the subject matter of the cases relied on by the District Court. This is a complex transaction with abundant consideration moving between all the parties to support all phases of it. There is no showing of fraud or overreaching. The purchasers made a fair contract to resell for a valid consideration but refused to perform.
All parties to the transactions were sui juris, were represented by counsel, and no showing of lack of disclosure or other disadvantage is made or urged.
"Restrictions on the free and untrammeled use and enjoyment of property are not favored by the law; but they will be upheld and given effect in accordance with the parties' intention as clearly shown by the language of the instrument or determined from the language considered in connection with the apparent object of the parties as determined from the surrounding circumstances." 7 Thompson on Real Property, § 3568; Blair v. Kingsley, Fla.App., 128 So.2d 889.
The decision sub judice produces a legal result in head-on direct conflict with the Rosenthal and Blair cases.
It is noteworthy that the option was not to purchase the utility company, but by the very language of the agreement, dated June 22, 1955, applied to
"The term water supply plant includes well fields, wells, storage tanks, pumps, plant building, treatment equipment and all other things necessary for a public water supply except supply mains and house connections. The term sewage disposal plant includes plant buildings, treatment equipment, lift stations, effluent disposal mains and all other things necessary for public sewage disposal except collection mains and house connections."
The same agreement in paragraph 7 provided:
"MacArthur shall have the option of purchasing the water supply and sewage disposal system including all mains from North Palm Beach at the Cost to North Palm Beach. The cost to North Palm Beach shall include items certified by the engineer as construction costs of water supply plant, sewage disposal plant, supply mains, collection mains and shall include land, engineering and legal expense but shall not include management fees or salaries of officers or directors during construction of the system. Construction loan interest and costs of such loans shall be included in cost. Any dispute arising out of the failure of the parties to agree on the cost of the water supply and sewage disposal system under this option shall be settled by Arbitrators, one to be selected by MacArthur, one by North Palm Beach and the other to be selected by those arbitrators selected by the parties. *185 The decision of a majority thereof shall be binding upon the parties. The period in which this option may be exercised by MacArthur shall commence on June 30, 1960 and the option may be exercised at any time prior to the full payment by North Palm Beach of any moneys advanced by MacArthur under this agreement. In the event that North Palm Beach intends to prepay the full amount due to MacArthur under this agreement, North Palm Beach shall give MacArthur written notice of such intention at least six months prior to making such payment, during which six month period MacArthur shall have the option of purchasing said system under the terms of this paragraph."
There should be no difficulty in making determination from this option as to what was to be included in the sale or the price to be paid, and in the event the price should be in dispute a settlement of that matter was provided by arbitration. Within life of the option the optionee MacArthur, on August 31, 1962, wrote North Palm Beach Utilities, Inc. stating
"I have been reviewing the situation involving your utility company and believe the time has come for me to exercise my option for its purchase as provided in the utility agreement dated June 22, 1955 between North Palm Beach, Inc. and me. You may therefore consider this letter formal notice of my desire to exercise this option.

"Will you please therefore prepare for me in accordance with paragraph 7 of the abovementioned agreement a detailed statement of the cost of the system." (Emphasis supplied.)
Thus, the offer to sell, as outlined in the option, together with the acceptance by MacArthur on August 31, 1962, ripened into a binding contract between the parties, leaving the cost of the utility system to be either agreed upon by the parties or determined by arbitration, as agreed upon in the agreement. It is our opinion, and we hold, that the letter of August 31, 1962 was adequate to exercise the option by MacArthur.
The option was at all times a burden on the utility systems and the land on which it was partially located, and that whatever interest in the land was acquired and held by the utility company was subject to the option, just as the property might have been acquired subject to a lease or outstanding mortgage.
It is also noteworthy that the question of clogging did not develop until after the parties were unable to agree on the cost of the utility system. When the Utility Company found itself unable to agree with MacArthur on a purchase price, it became its duty to activate the arbitration clause in the contract, but rather than doing so they injected for the first time a defense of clogging, making an attack on the equity of the contracts. The option price was not limited to the amount of the loan, but was fixed at the actual cost of the system and provided what the cost should include.
The transaction sub judice was an involved overall transaction where the seller agreed to sell land under circumstances where there was no compulsion to sell, and no compulsion on the part of the buyer to buy. Also involved in the transaction was an agreement by the seller to provide development funds for a utility system which were required only by the desire of the purchasers to buy and develop the land. It was not an instance where a debtor "under pressing necessities, will submit to ruinous conditions waiving the equity of redemption allowed him on breach of his obligation, in the expectation and hope of repaying the loan at the stipulated time and thus preventing forfeiture".
The doctrine against clogging the equity of redemption of a mortgage estate is an old English doctrine brought forward in this Country to prevent lenders taking an inequitable advantage of distraught borrowers. The doctrine would prevent the *186 mortgagee from taking through any trick, scheme or contrivance the equity of redemption from the borrower. Out of the doctrine developed the proposition that when the borrower repays his loan he is entitled to a return of that which was mortgaged as security for the loan  but no more. In the case at bar, the buyer of the land, who was the borrower of the money, acquired the land incumbered by the option, and thus when the borrower repaid the loan, as was done in this case, he was entitled to a return of the mortgage estate still subject to the burden of the option  (if the land had been subject to a lease when mortgaged to the lender, as soon as the borrower repaid the debt he would be entitled to a return of the land but it would still be subject to the lease). Here, the buyer-borrower never owned the land in fee simple, it was incumbered by the option at the same time the buyer-borrower acquired it. To force the lender to give back to the borrower more than the lender received would be grossly inequitable. It would require the lender to give to the borrower a clear title which is something the borrower never had and does not now have because of the existence of the option.
Furthermore, in "The Equity of Redemption" by Turner, published as a part of the Cambridge Studies in English Legal History, we find this interesting observation: 
"Thus, although a mortgagee cannot stipulate for any part of the property conveyed by the mortgage itself to remain his after the debt is satisfied, upon the principle that the mortgagor must be allowed to have his property back intact; a true collateral advantage may continue to be binding even after the loan is repaid. Hence, in the case before them it was held that an option of pre-emption on all sheep skins of the borrowing company for a period of five years, during which the loan was not to be called in, formed no part of the mortgage transaction, but was a collateral contract entered into as a condition of the company's obtaining the loan; that it was not a clog on the equity of redemption or repugnant to the right to redeem, and hence the lenders could exercise their right of pre-emption notwithstanding that the loan was paid off."
All of the agreements are executed under seal and the utility agreement recites: 
"In consideration of the mutual covenants contained herein and the further consideration of that certain agreement bearing this date between the parties hereto, entitled Purchase and Sale Agreement, it is hereby agreed by the parties as follows:".
Any question of lack of consideration therefore must fall by the wayside.
In consideration of all the agreements, considerations and mutual covenants by and between the parties, and the exercise of the freedom of contract in the market place in developing a commercial transaction, it is our opinion, and we hold, that the doctrine of clogging does not apply to the circumstances here present. We further hold that the letter of August 31, 1962 was adequate in form to activate the option and we find no equitable consideration that would dictate to a court of equity to refuse to require performance of the contracts.
In summary we hold: (1) That the option was and is in a solemn and binding obligation on the part of the respondents to negotiate and agree, if possible, with MacArthur on the cost of the water sewage and utility system; (2) If agreement could not be reached between the parties it became their duty to arbitrate the item of cost as provided in the utility agreement. (3) Upon appropriate determination of the costs of the system, it becomes and is the obligation of MacArthur to purchase same for the price so determined, and the duty of the utility company to convey, unincumbered ownership of the assets to MacArthur.
*187 Accordingly, the decision here under review is quashed, with directions that the District Court of Appeal reverse the decision of the lower court and enter an appropriate decree not inconsistent with this opinion.
It is so ordered.
O'CONNELL, C.J., and DREW, THORNAL and CALDWELL, JJ., concur.
ERVIN, J., dissents with opinion.
THOMAS, J., dissents and agrees to the conclusion of opinion of ERVIN, J.
ERVIN, Justice (dissenting):
As grounds for jurisdiction in his petition for writ of certiorari to this Court, Petitioner cites as conflicting with the decision of the District Court in the instant cause the cases of Rosenthal v. Le May (Fla.), 72 So.2d 289, 44 A.L.R.2d 336, and Blair v. Kingsley (Fla.App.2d), 128 So.2d 889. Upon studied analysis of these cases I fail to perceive any conflict.
As is related in the opinion of the majority, the instant situation involves a "purchase and sale agreement" and a contemporaneous "utility agreement." The purchase and sale agreement entered into by the Petitioner and Respondents clearly involved the taking back of a purchase money mortgage by the Petitioner-vendor. Inasmuch as the total purchase price was recited as $2,870,000.00 and the purchase money mortgage was for the amount of $2,470,000.00 (which was purchase price less payments made prior to and at the closing), it is evident that the resulting mortgagee-mortgagor relationship is not to be classified de minimis. When Rosenthal, supra, is examined, however, it is noted that the real property transaction there did not involve a mortgage. We held in that case that at the time of the transaction involved, the parties thereto intended a sale subject only to the right of repurchase as set out in the option simultaneously executed as a part of the same transaction. We specifically held that the transaction did not involve a mortgage. Thus there is a very real and pertinent distinction between Rosenthal and the instant case; in Rosenthal there was no consideration given as to the effect of an option on the right of redemption under a mortgage.
Blair, supra, may be distinguished from the instant case on the same basis as Rosenthal is. Blair is concerned with and discusses the validity of options to repurchase or pre-emptions made contemporaneously with a deed or agreement and supported by a consideration. A mortgage is not involved. It seems that it would be less than logical or reasonable to say that this is not a vital distinction. It is my opinion that inasmuch as the facts and the rule of law applied were different, there is no direct conflict between the decision of the District Court and the Rosenthal and Blair cases. As we said in Trustees of Internal Improvement Fund v. Lobean, Fla., 127 So.2d 98.
"* * * in order to invoke the jurisdiction of this court under Section 4(2), Article V of the Constitution * * * antagonistic principles of law must have been announced in a case or cases by the lower court based on practically the same facts. The conflict must result from an application of law to facts which are in essence on all fours * * *." (at 101)
Thus this is a case of first impression and presents no conflict of appellate decisions. I would hold that the writ should be discharged as having been improvidently issued.
Even when the issue of jurisdiction is screened out of consideration, I find that I must disagree with the conclusion of the majority of the Court regarding the merits of the instant case.
The "purchase and sale agreement" involved in the instant transaction provided *188 that Petitioner would convey to Resopndents an 1100 acre tract of undeveloped land in Palm Beach County. In the "utility agreement" which was executed simultaneously with the aforementioned "purchase and sale agreement" the Petitioner, individually, agreed to loan Respondents $800,000.00 toward the cost of constructing a water supply and sewage disposal system. In return for this loan Respondents agreed to give Petitioner a first mortgage encumbering the entire system so constructed. This "utility agreement" also provided that Petitioner should have an option to purchase the system, to be exercised during the period from when the first note became due until full payment by Respondents of any moneys advanced by Petitioner under the loan agreement. The aforementioned facts regarding the transaction under consideration are related for the purpose, and I think have the effect of showing that the instant case is not merely an example of "A" selling land to "B" and taking an option to repurchase all or a part of the land from "B."
The option was exacted and given contemporaneously with and as an integral part of the loan transaction and has the effect of permitting the optionee to defeat the borrower's right to redeem the mortgaged property. The "utility agreement" was contracted between the parties at the time of the loan, and the option, a part of the utility security agreement, was not supported by any independent consideration. When the transaction is examined in toto and consideration given the actual practical effect thereof, I find cogent logic in the able Chancellor's finding that:
"* * * the Utility Agreement was essentially a mortgage transaction. Both the Utility Agreement and the Purchase and Sale Agreement were complementary agreements, one to the other, each being a consideration for the other and they must be read together. The option agreement purports to give the plaintiff an absolute right to a conveyance of the water supply and sewage disposal system, in event he exercised the option prior to the final payment of the utility loan. It appears to the Court that the option operates to defeat the right of redemption of North Palm Beach Utilities, Inc., of said systems, which were mortgaged as security for the utility loan." (Emphasis supplied.)
The District Court correctly held that such an arrangement conflicted with the following general rule in regard to clogging the equity of redemption:
"`A mortgagor cannot, by any agreement made contemporaneously with or as a part of the mortgage transaction, bind himself not to assert his right or equity of redemption, however formally expressed or artfully concealed the attempt to do so may be. If the conveyance is a mortgage, the right of redemption is an inseparable incident, which cannot be restrained or clogged by agreement.' 22 Fla.Jur., Mortgages, Sec. 113." Emphasis added.
See also, Jones on Mortgages, § 1329, where, relating to the aforementioned principle, it is said:
"Any arrangement which is merely an evasion of the equitable rule that every mortgage is redeemable, or which is designed to enable the mortgagee to wrest the property from the mortgagor, is open to the same objection * * *." See also, Gross v. Hammond, 123 Fla. 471, 167 So. 373, 375.
It is argued that the rule against clogging should not apply to Petitioner primarily because it would have been easy to have handled the transaction differently  that he should not be "penalized" because the financing of the water supply and sewage disposal system could just as well have been financed through a bank without Petitioner's option to purchase being affected by the rule. But this begs the question; such were not the facts.
The majority opinion would create a new exception in the law on the basis that in order for an equity of redemption to prevail *189 over an option to purchase or other agreement designed to defeat redemption, there must be a situation where a debtor is under pressing necessities and submits to ruinous conditions to procure credit or loan consideration, waiving his equity of redemption. The rule does apply in such situations but is not limited only to instances where such conditions are found to exist. It applies in all mortgage transactions where a contemporaneous agreement such as the option claimed here is entered into unsupported by a consideration other than the mortgage loan which would defeat redemption. In order for this rule to be effective it is made to operate preventively rendering all clogging agreements invalid.
Our Court has long followed the rule announced in Stovall v. Stokes, 94 Fla. 717, 115 So. 828:
"* * * No contemporaneous understanding, however formally expressed or artfully concealed, will be permitted to deprive the debtor of this right [of redemption]. It can be defeated only by a subsequent agreement upon a further consideration." (At 830; emphasis supplied.)
In its review the District Court applied the general rule of equity applicable to the transaction. It found the "option" to be a contemporaneous agreement that was part and parcel of the mortgage transaction; and that the "option" was not a subsequent agreement based upon a further consideration.
Under the rule adopted today, lenders in Florida may legally bargain in mortgage transactions that borrowers give them options to purchase mortgaged property during the period the debt is outstanding. Thus under the rule of this case lenders will be permitted to receive, in addition to repayment of the mortgage loan with interest, the extra advantage of lopping off the equity of redemption by the exercise of an option to purchase. To me, this innovation opens many avenues for overreaching and oppression. The rule against clogging, like laws against usury, should be scrupulously maintained to insure fair dealing in the business community. Rapacious conduct and unequal bargaining in the money lending field should be frowned upon in Florida.
The argument that consideration for the option is present because the instrument reflecting the option is under seal is completely lacking in merit. Formality rather than substance should not prevail.
In the words of the Chancellor, "* * * the exercise of specific performance in this instance would be inequitable." It appears that the utilities system entailed an investment of the mortgagor of more than $3,800,000.00, but Petitioner-mortgagee attempted to exercise the claimed option by notifying the mortgagor that he would negotiate and close for only $1,648,059.68. This finding of inequity does not seem illogical or erroneous. Rather, it appears that the Chancellor was cognizant of and acting in accordance with the following equitable principles:
"A court of equity, before rendering a decree of specific performance, will require that the consequences of granting such a decree be equitable and just * * in every case, therefore, where the remedy of specific performance is sought, the question before the court is whether the exercise of such power by the court is actually demanded to subserve the ends of justice. And unless the court is satisfied that this is so in every respect, it will refuse to allow such relief." 29 Fla.Jur., Specific Performance § 42, pp. 536-537.
Even if the option to purchase had been valid, it does not appear Petitioner effectively exercised it. Instead of maintaining his original offer to exercise the option to purchase the system at its actual cost to mortgagor and going to arbitration if he disputed the cost figure submitted by the mortgagor, Petitioner subsequently unilaterally departed from the terms of the option by only offering said amount of $1,648,059.68 for the system. It thus appears the *190 option offer was not effectively exercised and maintained by Petitioner as the law relating to options requires. See 33 Fla. Jur., Vendor and Purchaser, § 20, and 55 Am.Jur., Vendor and Purchaser, § 39.
In sum, it appears: (1) There is no conflict; this is a case of first impression where factually and resultwise there is no conflict of appellate decisions, nor is there any conflict of legal principles. Therefore, a second appeal should not be granted, contrary to our constitutional jurisdiction. (2) The option to purchase was a mere clogging device defeating the equity of redemption. To allow options to purchase as an added advantage to lenders in mortgage transactions opens avenues for oppression hitherto unrecognized in our state. (3) The option was not effectively exercised and the manner in which it was sought to be exercised was found by the Chancellor to be grossly inequitable.
THOMAS, J., agrees to conclusion.