The complainants are husband and wife,. He is in his seventieth year and she is in the fifties. They are illiterate people, the husband having been a laborer all his life. He was born in that part of Austria which is now called Czecho-Slovakia, and is of an intellectual standing that might be assumed from these facts. The defendant is a man in the prime of life, of keen mind, good address, and engaged in the real estate and insurance business. The complainants had succeeded in accumulating sufficient funds and credit to embark upon the construction of a small two-family house upon a tract of land in a suburb named Wallington, fifty by one hundred feet in dimension. After the work had proceeded substantially they found themselves lacking, to the extent of about $1,500, the funds necessary for the completion thereof, and applied to the defendant, who advanced them that sum. He thereupon took from them, not the usual mortgage, but a deed dated October 30th, 1923, with a defeasance clause reading as follows: *Page 203 
"This deed is given as security of (sic) fifteen hundred ($1,500) dollars, to be paid in installments of not less than one hundred dollars every three months, with interest, on unpaid balances."
There is considerable discrepancy as to the amount received by the defendant in pursuance of the foregoing, but it is admitted that little was paid and a gross default by the complainants. In this state of affairs the defendant, the following spring, was made a defendant in a suit to foreclose the right of redemption under a tax lien. At that time the complainants were also in default on the payments due under a prior mortgage held by the building and loan association; taxes were in arrears, and repairs necessary for the preservation of the premises. To protect his previous investment of $1,500 the defendant discharged these indebtedness and then took another deed from the complainants, dated May 23d 1924. This was an absolute conveyance of all the right, title and interest of the complainants in and to the above premises. Simultaneously therewith, all of the parties executed a paper called an agreement which, after reciting a description of the property and the above defaults, provided that if the defendant should sell the property within six months from that date any excess in the selling price above the moneys advanced and to be advanced by him should be paid to the complainants. No such sale was made within the time limited, and the defendant now claims the property as his own, free of any right or claim of the complainants.
I do not think he should be permitted to do so. In the first place, while it is not free of difficulty, I am inclined to believe that the complainants did not realize what they were doing when the second deed was executed. They are each unable to read, which, of course, forms an exception to the rule that one will not ordinarily be permitted to prove that he did not understand what appears over his signature. There are a number of reasons for my rather inclining to this belief. The case is replete with perjury, and I am convinced that each party was prepared to testify to anything if it would help his case. But the boldest and clearest instance *Page 204 
of lying upon the witness-stand that I have ever known was the case of the witness Halka, the only one produced by the defendant to corroborate his story. The defendant says that after the delivery of the second deed he entered into an agreement of landlord and tenant with the complainants, under which they were to pay him the sum of $20 a month as rent. This is denied by the complainants. Halka testified to one single fact, which was that, at a date grossly at variance with the defendant's testimony, he had heard the defendant ask the male complainant for a monthly installment of rent, to which the latter replied that he had no money with which to make payment. When hotly pressed by complainant's counsel on cross-examination, this man presented every evidence of being a perjurer. Finally, he exploded in a blasphemous ejaculation, for which I would have committed him had it not been clear that he was a man of foreign origin, unfamiliar with our practices and customs, to whom language of the kind he used is a normal part of his vocabulary; but his objection to having his story tested, his physical twisting and turning on the stand, the reddening of his face to the hair line, his attempts to fence, his delays in answering, and his hesitation when I asked him if he was telling the truth, all stamp him as a liar and cannot be accounted for on the score of honest nervousness.
It is true that a reputable member of the bar testified that he had explained to the complainants the contents of the documents which lie at the bottom of this case, as well as the consequences thereof. I have no doubt that he undertook to do so in accordance with the duties of his office, but I have great doubt that he accomplished his purpose. In the first place, he is a busy lawyer now attempting to recall exactly what he did at a time, nearly two years ago, in the performance of a routine duty that I suppose it is fair to assume he has discharged on more than a thousand occasions. Besides, he testified himself and wanted it to be perfectly clear that he did not represent any of the parties, but was told by them what they wished to effectuate, and merely acted as the scrivener under whose direction the instruments were *Page 205 
prepared and witnessed and took the acknowledgment of the parties. From this very fact I draw the conclusion that he was rather irritated, and would, naturally, be desirous of having the transaction completed and the participants therein out of his office. Furthermore, I do not believe that his memory is very clear, because, as it appeared to me in the court room, he nowhere in his direct or cross-examination clearly and specifically testified to having explained to the complainants the result and consequences of their acts. It was not until I pressed the subject home so as to make him realize the absence of it that he definitely and unmistakably told of doing any more than to take the acknowledgment in a perfunctory manner. For this I do not blame him, because it is entirely probable, as the proofs indicate, that the defendant shrewdly explained the transaction as he wished it to be, in the presence of the illiterate complainants, and the master quite naturally assumed that it was well understood and required nothing more than the usual explanation that the instrument was a deed conveying certain property for the nominal consideration of one dollar. Another significant feature is, that he testified to actions upon the part of the parties while in his office a few days before that would have been sufficient to have irritated any lawyer to the point where he would desire nothing so much as to be rid of them.
But irrespective of where the truth lies, this transaction cannot stand. It is a typical case for the interposition of this court. The parties dealt with each other in a more or less fiduciary relation, according to the testimony for the complainants. They relied upon the defendant. They were old and entering upon the age of senility, while he was young and vigorous in body and mind. They were intensely ignorant. He displayed evidence of a considerable training, as he glibly spoke of "the twenty days within which to file an answer," and other ordinary expressions use frequently by lawyers that showed considerable knowledge of legal subjects. But, above all, there was that indefinable influence of the creditor over a debtor described by Professor Pomeroy *Page 206 
in section 1193 of his work on Equity Jurisprudence, and in the foot-note and cases appended.
In the last place, the defendant had advanced money for the preservation of the complainant's property, and for this he was entitled to security, but to nothing more, unless it is clearly shown that it was so understood and agreed between the parties. The original relations between them were those of mortgagor and mortgagee, and under the proofs in this case there has not been enough established by the defendant to defeat the doctrine so zealously enforced in this court, which is sometimes expressed in the phrase, "Once a mortgage always a mortgage."
I am not entirely clear as to the relation that the amount advanced by the defendant bore to the value of the premises on May 23d 1924. The complainants produced a witness who testified to a value of $10,000 as of that date. The defendant, himself, testified to a value of about $8,000. I was poorly impressed by them, both as expert witnesses on value of real property and as lay witnesses. The defendant was vitally interested, besides being unable to give reasons for his opinion, and the other did not seem to have any clear idea of the advance in values during the last two years. There was a building and loan mortgage upon the premises to secure the repayment of a loan of $6,000, which had been reduced, as I recall the meager testimony on the subject, to about $4,000 or $4,500. In addition, the defendant was entitled to recover his loan of $1,500 and an unascertained sum, being the aggregate of those charges he had to pay after the making of what has been called the second deed. His testimony is that the last-mentioned amount now approximates $1,300, but must have been very considerably less. But, in any event, unless the complainants secure relief, and assuming even the valuation placed upon the premises by the defendant, he would profit at the expense of the former to a sum of at least upwards of a thousand dollars, and this I consider to be sufficient to cause this court to act, in view of the deplorable circumstances of the complaining parties. *Page 207 
If counsel for the complainants apprehends that any amendment is necessary to mold the pleadings to the theory followed on the final hearing, an order will be made to do so.
The complainants tendering themselves willing to redeem their land by fully reimbursing the defendant, I will refer the matter to a master for the purpose of stating an account.