123 N.J. Super. 530 (1973)
303 A.2d 898
HUMBLE OIL & REFINING COMPANY, A DELAWARE CORPORATION, PLAINTIFF,
v.
JOSEPHINE VENICE ROKITA DOERR, (ALSO KNOWN AS JOSEPHINE VENICE AND AS JOSEPHINE VENICE ROKITA) AND GEORGE H. DOERR, HER HUSBAND, AND THE NATIONAL STATE BANK OF ELIZABETH, N.J., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 11, 1973.
*534 Mr. Arnold M. Smith for plaintiff.
Mr. Aldan O. Markson for defendant Josephine Venice Rokita Doerr (Messrs. Pollack and Markson, attorneys).
Mr. John M. Mackenzie for defendant The National State Bank, Elizabeth, N.J. (Messrs. Mackenzie, Welt & Dreier, attorneys).
ACKERMAN, J.S.C.
The ancient doctrine that a mortgagor's equity of redemption may not be "clogged" has rarely been involved in litigation in this state. This case involves a novel application of the doctrine and, so far as research by counsel and the court has disclosed, there are no precedents directly in point. The specific point involved is whether the doctrine, which bars a mortgagee from clogging the mortgagor's equity of redemption and prohibits him from taking an option to purchase the property from the mortgagor as a part of the original mortgage transaction, also bars the mortgagor's guarantor from taking such option. In the circumstances of this case it is the conclusion of the court that it does.

I
Certain of the factual issues were hotly contested, including those relating to the value of the property at the time of the option, the alleged ignorance of the optionors as to the existence and meaning of the option, and whether or not there were fraudulent misrepresentations and concealment in the obtaining of the option. However, the case does not *535 really turn upon the resolution of these issues and the result is the same regardless of how they are determined. The basic facts are as follows.
Defendant Josephine Venice Rokita Doerr (hereinafter referred to as "Josephine") is the owner of a piece of real property located on the northeast corner of Boulevard and Michigan Avenue in Kenilworth. The parties agree that it is now one of the choice locations for a gasoline service station in Union County. The property was acquired in about 1944 by Pat Venice, Josephine's first husband. He intended to erect a service station thereon but died in 1947 without having carried his plans into effect, and Josephine succeeded to the sole ownership of the premises as well as to other parcels of real estate in Kenilworth. A few years thereafter Josephine's family, and in particular her brother Sal Amoroso, erected a three bay service station on the property and operated same, apparently making "rent" payments from the income of the business to Josephine. In connection with the initial construction of the station the property was mortgaged to the Union County Trust Company, which granted a $12,000 loan for ten years at 5% interest in 1952 to Josephine, her brother and his wife.
In 1953 Josephine remarried. Her second husband, Victor W. Rokita (hereinafter "Victor"), took over the management of the service station. In 1958 he took steps to add three bays to the garage in order to expand the facilities for performing automotive repair work. He went to the Union County Trust Company, which already held the mortgage on the premises, to arrange for additional financing, and that bank apparently agreed to advance approximately $20,000 secured by first mortgage on the land and building. These plans came to the attention of plaintiff Humble Oil & Refining Company (then Esso Standard Oil Company and hereinafter referred to as "Humble"), whose products were sold at the station. John Alden, the Humble representative who serviced Victor's account, approached Victor and told him that Humble could get him better terms  *536 $35,000, rather than $20,000, at a lesser interest rate and for a longer term. Alden discussed the matter and negotiated first with Victor alone and then with both Victor and Josephine. These favorable terms were to be obtained by leasing the station to Humble at a rental equal to the amount to be paid each month by Victor and Josephine on the new mortgage, which would be granted by The National State Bank, Elizabeth, N.J., and by having Victor and Josephine assign the Humble rental payments to the bank as additional security. Humble would then lease back to them at the same rental and they would continue to operate the service station. (This arrangement is referred to as a "two-party" lease. See Point IV, infra.)
As the result of the negotiations it was agreed that the financing arranged by Humble would be accepted, and a lease was entered into between Victor and Josephine, as lessors, and Humble, as lessee, under date of September 5, 1958, for a 15-year term commencing on September 1, 1959 (approximately one year later) and ending on September 1, 1974, at a rental to be paid by Humble of $272.30 a month, the exact amount required to be paid each month to The National State Bank by Victor and Josephine under the contemplated mortgage. This lease, entitled "Lease to Company," was written on a printed Humble form bearing the legend "Lessor Built S.S.," which was drafted by Humble for use as the standard lease form to be utilized in instances where Humble leased premises with stations already built thereon or being constructed thereon by owner-lessors. The provisions of this form were obviously designed to be fully protective of Humble's interest as lessee.
The provision of the lease which is directly involved here is that which granted a purchase option to Humble. The option provision recites that the lessors, "in consideration of this lease," grant to Humble the option to purchase the property for the sum of $150,000 "at any time" during the term of the lease. The price is to be paid on transfer of good and marketable title by the lessors by warranty deed *537 free and clear of all encumbrances, and requires that title should be closed and deed delivered on the 30th day after the exercise of the option, unless extended by mutual agreement.
On May 29, 1959 Victor and Josephine entered into a $35,000 construction mortgage with The National State Bank and formally assigned their interest in the Humble lease to the bank. Thereafter the additional three bays were apparently constructed and on January 12, 1960, the 15-year permanent mortgage loan for $35,000 was entered into. The new mortgage provided that, in addition to the monthly payments of $272.30, the Rokitas were required to deposit with the bank monthly payments equal to one-twelfth of annual estimated taxes. It also required maintenance of insurance and contained the customary provision that if the mortgagors did not make tax and insurance payments, the mortgagee could make them and add such amounts to the indebtedness of the mortgagors. A new note agreement was also entered into on January 12, 1960 between the bank and the Rokitas which contained a formal assignment to the bank of the Humble lease. This agreement provided that as "collateral security" the Rokitas assigned their interest in the Humble lease to the bank, and they agreed that the bank should collect the "rents, issues and profits accruing out of the premises" demised to Humble until repaid the full sum of $35,000 plus interest, and further, until the bank had been repaid all sums paid by it pursuant to the loan agreement and mortgage "and not repaid to it out of the rents derived from said premises." By the note agreement, as well as the mortgage, the Rokitas agreed to pay to the bank monthly a sum equal to one-twelfth of taxes. The note agreement expressly provided that if Humble should fail to pay any installment of rent provided for in the lease, or the Rokitas should default in performance of any of their obligations contained in the note, mortgage or lease, and the default continued for ten days, the bank at its option could demand immediate payment of the entire unpaid mortgage *538 balance. The net result of this agreement was that a default by Humble or a failure by the Rokitas to comply with any of the conditions of the lease could constitute a mortgage loan default by the Rokitas.
By an agreement dated January 12, 1960, the same date on which the permanent mortgage papers were signed for the bank, a supplement to the Humble lease was signed by the Rokitas and witnessed by the attorney for the bank, modifying the lease so that the original term thereof commenced on February 1, 1960. This supplement ratified and confirmed all other terms of the lease.
On January 18, 1960 a lease was entered into between Humble, as lessee, and Victor Rokita, trading as Mayfair Esso Servicenter, whereby Humble leased the premises to Victor for a monthly rental of $272.30 a month, the same amount which Humble was required to pay to Josephine and Victor under the lease to Humble and the same amount which Josephine and Victor were obliged to pay each month to the bank. This lease was for a period of one year and thereafter from year to year unless cancelled by 30 days' notice directed to the end of a yearly renewal period. The lease was written on a printed Humble form, and, like the other Humble lease form, was obviously designed to fully protect Humble's interests. It required the lessee to pay all taxes, provided general indemnity to Humble arising from injuries or accidents on the premises, and provided that Humble could terminate the lease and re-enter the premises without formal demand in the event that any rent was unpaid or default made in any other covenant of the lease.
Thereafter Victor encountered personal difficulties which affected his management of the service station and his relationship with his wife. Josephine divorced him in 1965. On December 16, 1961 his lease with Humble was cancelled by mutual consent and on the same day Humble leased the premises to Mayfair Servicenter, Inc., of which Salvatore Amoroso, Josephine's brother, was president. This lease was on the same form and contained the same terms as the *539 earlier lease to Victor. The latter lease has continued in force to date and Josephine's son has in recent years managed the station.
In May 1968 Josephine married George H. Doerr. Prior to the marriage Doerr signed an agreement waiving all right to curtesy in property owned by Josephine. He defaulted and did not participate at the trial. He has no interest in the property.
By letter dated October 7, 1968, approximately ten years after the original lease was signed and 8 1/2 years after the 15-year term of the lease commenced to run under its terms as modified, Humble wrote to Josephine and Victor exercising the option to buy the premises, free and clear of all encumbrances, for $150.000. Humble re-exercised its option by letter dated March 3, 1969. When Josephine replied through her attorneys that the option had no legal validity, Humble started this action.
Humble sues for specific performance and, in the alternative, for damages. It claims that the value of the property in 1969 at the time of final exercise of the option was $240,000. Josephine filed an answer denying that she was even aware of the option prior to receipt of Humble's first letter exercising it in October 1968. In addition, she charged that the option was granted because of mutual mistake or mistake on her part induced because of inequitable conduct on the part of Humble, and that she was caused to sign the lease because of Humble's fraud and inequitable conduct in that she, a person of limited education and without business experience, and without legal representation or independent advice, was induced to sign the complicated lease and mortgage papers which she did not understand. The effect of this, she averred, was (a) to deprive her of all income from the real estate for 15 years while still requiring her to pay taxes, repairs, etc.; (b) to cause her to pay unconscionable attorneys' fees and other charges to the bank; (c) to require her to option her real estate and the business located thereon for a consideration having no reasonable relation to the true value thereof; *540 (d) to require Humble to spend no money, and (e) to cause Humble to be unjustly enriched. She further charged that Humble fraudulently represented that the lease would contain no option and that it fraudulently concealed the same and that she signed the lease in reliance thereon. Finally, on the basis of the above, she counterclaimed for reformation of the lease, seeking to have the option clause expunged therefrom.
As is apparent from the above recitation, at no time in her pleadings did Josephine spell out in so many words that the option was invalid because it constituted an impermissible clog on her equity of redemption. Nor was such theory specifically mentioned in her contentions contained in the pretrial order or in the trial briefs submitted in advance of trial. It was first advanced at the end of the case after the court had referred counsel to the decision in Barr v. Granahan, 255 Wis. 192, 38 N.W.2d 705, 10 A.L.R.2d 227 (Sup. Ct. 1949). Humble argues that the clogging doctrine may not be considered in the case because there was no notice to it that the doctrine would be relied upon. However, defendant's answer does spell out facts and contentions which give notice that the option is claimed to be invalid because, among other reasons, it is unconscionable and inequitable, unjust to the defendant, and unjustly enriches Humble at defendant's expense, and her contentions in the pretrial order, among other things, state that "the option provisions of the lease and the lease itself are so manifestly unfair, unreasonable and unjust, so as to preclude the remedy of specific performance, and to require the reformation of the lease by the elimination of the option provisions." The factual allegations and contentions in her answer and the pretrial order, and the evidence adduced in support thereof, warrant relief on any legal theory that accommodates them, including the clogging doctrine, and Humble's objection is obviously without merit. See Wimberly v. Paterson, 75 N.J. Super. 584, 604 (App. Div. *541 1962); Vorhies v. Cannizzaro, 66 N.J. Super. 551, 558 (App. Div. 1961).

II
I have concluded that Humble was not guilty of fraudulent misrepresentations or concealment and that Josephine is not entitled to relief under normal rules because of mistake. No useful purpose would be served in reviewing in detail the testimony adduced at the trial on these issues. It was established that Josephine's schooling ended at the fifth grade. However, her testimony that she did not know of the option until Humble exercised it did not impress me as being credible. I do not believe that she was candid and truthful in her protestations that she was completely ignorant as to what she signed and in her attempts to deny the genuineness of her signature on various documents. I believe that she placed reliance on her husband Victor, who had more formal education than she, and I believe Alden's testimony that he dealt primarily with Victor and told him that Humble insisted on the option if the company were to be involved. Although the claim is that Victor was an alcoholic and that he was drinking at the time the lease was signed in 1958, I do not believe he was lacking competency at the time the lease was negotiated and consummated. Nor do I believe that Alden told them that they should not get counsel or that he tried or succeeded in "concealing" the option from them. He denied that he told them that the option was simply a right of first refusal. I believe his testimony, referred to hereinafter, as to the casual way in which the option price contained in the lease was fixed and that Josephine told him at that time that she did not want to sell the property.
It may well be that the Rokitas, and Josephine in particular, did not really understand all of the ramifications of the option. But they can read and they did place their initials alongside the option provision in the lease, which *542 contained the option price inserted in ink. It was shown that they went to Josephine's present law firm on June 22, 1959, at a time prior to the execution of the permanent mortgage, when a modification to the lease, correcting the legal description of the property but ratifying and confirming the lease in all other respects, was submitted to them for signature, and the partner so consulted acted as a witness to their signatures and took their acknowledgments to the modification. There was testimony to the effect that he told them that it was too late to do anything about the option. Moreover, in May 1959, at the time the construction mortgage and first assignment of the lease to the bank were being signed, Josephine and Victor signed a statement prepared by the bank's attorney which stated that they were aware that said attorney had nothing to do with the Humble lease prior to its execution and which specifically recited, "We further understand that said lease contains a clause granting Esso an option to buy the property at $150,000.00 at any time during the term of the lease, which is satisfactory to us." In the circumstances, Josephine is not entitled to relief under conventional doctrines of fraud or mistake  she was not completely ignorant of the option.
Nor is she entitled to relief, setting aside for the moment the fact that the option was given in connection with a mortgage loan, because the option price was inadequate in the light of the value of the property at the time it was given, or because of an increase in the value of the premises during the years since the granting of the option. She originally advanced as an alternative argument to the court that, at the very least, applying conventional rules, plaintiff should be denied specific performance and relegated to recovery of damages because the option price was grossly inadequate. There are precedents which hold that the court should deny specific performance where the consideration is grossly inadequate. See Rodman v. Zilley, 1 N.J. Eq. 320, 324 (Ch. 1831); Crane v. Decamp, 21 N.J. Eq. 414, 418 (E. & A. 1869); Page v. Martin, 46 N.J. Eq. 585 (Ch. *543 1890), rev. on other grounds, 46 N.J. Eq. 589 (E. & A. 1890); Williams v. M.E. Blatt Co., 95 N.J. Eq. 326 (E. & A. 1923); Migel v. Bachofen, 96 N.J. Eq. 608 (E. & A. 1924); De Caro v. De Caro, 13 N.J. 36 (1953). Here, however, the option price was not grossly inadequate when compared to the value of the land in 1958-1959. Humble's expert testified that the value of the property was $85,000 prior to the erection of the three additional bays and $100,000 after the erection of the additional bays. He also testified that the value of the land at the time of the exercise of the option in 1969 was $240,000. The defendant's expert testified that the value of the land was $150,000 in 1958 prior to the erection of the additional bays and $180,000 after the erection of the bays. He was not asked to give testimony as to the value of the land at the time of the exercise of the option.
I am inclined to accept the valuations expressed by Humble's expert. Not only was I impressed by his qualifications and expertise, the basis for his opinions, and his candor and truthfulness in answering questions, but it was demonstrated to my satisfaction that some of the underlying facts upon which defendant's expert based his opinions, including gallonage prices, used in computing value based upon income, were open to question. It may also be noted that on July 27, 1959 Victor Rokita, in listing assets on an application to Humble for credit, listed the six-bay station as having a value of $100,000. I conclude that the market value of the real estate at the time when the option was granted was approximately $100,000 and clearly less than the option price. However, even if defendant's values were accepted, the option price would not be considered grossly inadequate in the absence of other considerations.
It is also well settled that, in the normal case, an option to purchase at a named price cannot be voided merely because of subsequent enhancement of the value of the property. See Behr v. Hurwitz, 90 N.J. Eq. 110 (Ch. 1918); Gulf Oil Corp. v. Montanaro, 94 N.J. Super. 348, 357 (Ch. *544 Div. 1967); Humble Oil & Refining Co. v. Lennon, 94 R.I. 509, 182 A.2d 306 (Sup. Ct. 1962); Annotation "Change of conditions after execution of contract or option for sale of real property as affecting right to specific performance," 11 A.L.R.2d 390, 406-411 (1950), and cases involving service station leases cited infra. Apart from other considerations, therefore, the increase in value of the property would not render the option unenforcible.
Other arguments advanced by Josephine are also without merit. Her contention that she was required to pay unconscionable attorney's fees and other charges to the bank is clearly without factual basis, and, even if true, would afford no defense to Humble's suit.
It is evident, therefore, that if it were not for the fact that the option was given in connection with a mortgage loan, Josephine would not be entitled to relief. Because it was so connected however, the option is void and unenforcible. It is a clog on Josephine's equity of redemption.

III
For centuries it has been the rule that a mortgagor's equity of redemption cannot be clogged and that he cannot, as a part of the original mortgage transaction, cut off or surrender his right to redeem. Any agreement which does so is void and unenforcible as against public policy. A classic statement of the rule appears in 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 1193 at 568 et seq.:
§ 1193. Once a mortgage, Always a Mortgage; Collateral Agreements and Agreements Clogging the Equity of Redemption.  In general, all persons able to contract are permitted to determine and control their own legal relations by any agreements which are not illegal, or opposed to good morals or to public policy; but the mortgage forms a marked exception to this principle. The doctrine has been firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue. If the instrument is in its essence a mortgage, the parties *545 cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.
See also 4 American Law of Property (1952), §§ 16.58-16.61 at 106 et seq.; Osborne, Handbook on the Law of Mortgages, (2nd ed. 1970), §§ 96-99 at 144 et seq.; 1 Glenn on Mortgages (1943), § 44 at 278; Jones on Mortgages (6th ed. 1904), §§ 250, 251 at 185-187; 55 Am. Jur.2d, Mortgages, § 514 at 504, and § 1220 at 1001.
As indicated by the above authorities, the doctrine is universally applied, both in the United States and England, and it has long been a firm part of the law of this State. See Youle v. Richards, 1 N.J. Eq. 534 (Ch. 1832); Vanderhaize v. Hugues, 13 N.J. Eq. 244 (Ch. 1861); Griffen v. Cooper, 73 N.J. Eq. 465, 466 (Ch. 1907); McKlosky v. Kobylarz, 99 N.J. Eq. 202 (Ch. 1926); Mansfield v. Hammond, 117 N.J. Eq. 509, 511 (E. & A. 1935); Dorman v. Fisher, 31 N.J. 13 (1959); Smith v. Shattls, 66 N.J. Super. 430, 436 (App. Div. 1961); see Hardyston National Bank v. Tartamella, 56 N.J. 508, 513 (1970).
The same rule applies to pledges of personal property. Endicott v. Marvel, 81 N.J. Eq. 378 (Ch. 1913), aff'd 83 N.J. Eq. 632 (E. & A. 1914), bill of review dismissed 85 N.J. Eq. 52 (E. & A. 1915); Moss Industries v. Irving Metals Co., 141 N.J. Eq. 421 (Ch. 1948) aff'd 142 N.J. Eq. 704 (E. & A. 1948); Restatement, Security, § 55 at 152, 153; Annotation "Validity of Agreement Clogging Equity of Redemption from Mortgage or Pledge of Personal Property," 24 A.L.R. 822 (1923); Bromley v. Bromley, 106 Ga. App. 606, 127 S.E.2d 836 (Ct. App. 1962).
*546 As a part of the doctrine it is well settled that an option to buy the property for a fixed sum cannot be taken contemporaneously by the mortgagee. As stated in 4 American Law of Property, § 16.59 at 108:
* * * By a parity of reasoning, an agreement allowing the mortgagee to keep any part of the mortgaged property, redemption being limited to the balance, fails. Nor is the mortgagee allowed at the time of the loan to enter into an option or contract for the purchase of the mortgaged property. This rule was established early and still continues to be the law.
In 1 Glenn on Mortgages, § 44 at 278, the author, after referring to the decision in Howard v. Harris, 1 Vern. 7 (1681), which originated the famous phrase "once a mortgage, always a mortgage" and struck down a restriction on redemption, said:
* * * Within the next forty years the idea was extended so as to strike down a kindred effort; it being held that an option to the mortgagee, to purchase the equity of redemption (the loan, of course, being cancelled out in the process), was void, and thus the mortgagor could redeem. This continues as the rule of today, and it is applied without regard to the presence or absence of usury laws. Here, indeed, we have a real `clog' upon the equity of redemption; and, it being incompatible with all sound ideas of loan and security, our courts, English and American, are at one in denouncing such an arrangement, no matter how it may be disguised.
Accord: Osborne, op. cit., § 97 at 146; Willett v. Winnell, 1 Vern. 488, 23 Eng. Rep. 611 (Ch. 1687); Orby v. Trigg, 9 Mod. 2, 88 Eng. Rep. 276 (Ch. 1722); In re Edwards's Estate, 11 Ir. Ch. R. 367 (Ch. 1861); Linnell v. Lyford, 72 Me. 280 (Sup. Ct. 1881); Wilson v. Fisher, 148 N.C. 535, 62 S.E. 622 (Sup. Ct. 1908); see Hyndman v. Hyndman, 19 Vt. 9, 46 Am. Dec. 171 (Sup. Ct. 1845); Dismorr v. George, 17 V.L.R. 626 (Victoria Sup. Ct. 1891); Samuel v. Jarrah Timber and Wood Paving Corp. (1904) A.C. 323; Arnold v. National Trust Co., 5 Alta. L.R. 214, 7 Dom. L.R. 754, 22 West L.R. 693 (Alberta Sup. Ct. 1912); Lewis v. Frank Love, Ltd. (1961) *547 1 All. E.R. 446, 1 W.L.R. 261; Barr v. Granahan, 255 Wis. 192, 38 N.W.2d 705, 10 A.L.R.2d 227 (Sup. Ct. 1949); see Bromley v. Bromley, supra; Wyman, "The Clog on the Equity of Redemption," 21 Harv. L.R. 459, 462 (1908); Note, "Bargains between Mortgagor and Mortgagee," 136 L.T. 137-139 (1913); 59 C.J.S., Mortgages, § 818 at 1561; 55 Am. Jur.2d, Mortgages, § 514 at 505.
The basic policy behind the doctrine has remained vital and unchanged over the years. As stated by our Court of Chancery in 1832 in Youle v. Richards, 1 N.J. Eq., 534, 538, "There would have been, without it, a door open for the imposition of every kind of restraint on the equity of redemption, and thereby the borrower, through necessity, would have been driven to embrace any terms, however unequal or cruel; which would have tended greatly to the furtherance of usury, and the conversion of the equitable jurisdiction of the court into an engine of fraud and oppression". In Jones on Mortgages, § 251 at 187, the reason for this rule favoring mortgage debtors is that "their necessities often drive them to make ruinous concessions in order to raise money." The Restatement, Security, § 55 at 152, states that such agreements are held to be against public policy and void because "it has long been recognized that * * * creditors are often in the position to exact severe terms from debtors." Pomeroy, op. cit., § 1193 at 570 states the reason for the rule as follows:
This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will.
In 4 American Law of Property, § 16.59 at 109, the author summarizes the policy behind the doctrine as follows:
*548 * * * the decisions seem correct upon a principle which underlies relief from all penalties and forfeitures. That principle is that relief will be granted where there has been a misreliance upon the "mirage of hope." Ordinarily the courts have talked in terms of granting relief because of solicitude for the "impecunious landowner" or "necessitous men [who] are not, truly speaking, free men." But another most important factor is in the mortgagee playing upon the optimism to which all mankind is prone, the "over-confidence in ones own capacities and faith in a special providence [which] leads us to over-sanguine commitments." Equity takes this human failing into account.
So strong is the policy behind the rule that it is applied to hold such options absolutely void and unenforcible regardless of whether there is actual oppression in the specific case. In 1904, in the leading case of Samuel v. Jarrah Timber and Wood Paving Corp., supra, the question of whether it should continue to be so applied was squarely presented to the House of Lords for reconsideration and possible change. The House affirmed the Court of Appeals and held that an option to purchase for a fixed sum taken by a mortgagee as a part of the original transaction was void as a clog on the equity of redemption regardless of fairness. Although it acknowledged that the rule might be used as a "means of evading a fair bargain come to between persons dealing at arms length and negotiating on equal terms," it nevertheless concluded that, in view of the long line of precedents applying the doctrine as a fixed rule without deviation, there should be no change therefrom. Noting that the virtue of such a fixed rule is that it serves "to obviate the necessity of inquiry and investigation in cases where suspicion may be probable and proof difficult," Lord Macnaghten said:
Having regard to the state of authorities binding on the Court of Appeals, if not this House, it seems to me that they could not have come to any other conclusion, although the transaction was a fair bargain between men of business without any trace or suspicion of oppression, surprise or circumvention. [(1904) A.C. 323, 325]
*549 The same rule was applied in the recent case of Lewis v. Frank Love, Ltd., supra, where Judge Plowman for the English Chancery Division, holding that "an option to purchase, if exercised, indubitably does stop a mortgagor from redemption," followed the Samuel case and ruled:
* * * the doctrine of a clog on the equity of redemption is a technical doctrine which is not affected by the question whether in fact there has been oppression, and which applies just as much where parties are represented, as they were here, by solicitors. [(1961) 1 All. E.R. 446, 454]
See also Arnold v. National Trust Co. and In re Edwards's Estate, supra.
Where the option is a part of the original loan transaction it is therefore absolutely void.
Moreover, it is also the law that although a mortgagor can at a later date, after the original mortgage transaction, surrender his equity of redemption to the mortgagee and enter into an option or agreement to sell, it must be a fair bargain for an independent and adequate consideration. From the earliest days courts of equity have carefully scrutinized such arrangements. This rule is universally applied, in New Jersey and elsewhere, and it applies both to mortgages of real property and pledges of personal property. Normally the burden is imposed upon the mortgagee to prove fairness. The general rule is stated in 55 Am. Jur.2d, Mortgages, § 1220 at 1001:
However any contract by which the mortgagor sells or conveys his interest to the mortgagee is viewed suspiciously and is carefully scrutinized in a court of equity. The sale and conveyance of the equity of redemption to the mortgagee must be fair, frank, honest, and without fraud, undue influence, oppression, or unconscionable advantage of the mortgagor's poverty, distress, or fears of the position of the mortgagee.
The black letter rule of Restatement, Security, § 55 (2) at 152 is that such agreement is "valid if the pledgee sustains the burden of showing that the bargain is free from fraud *550 and oppression," and the comment thereto (at 153) acknowledges as the reason for the rule that "[s]ubsequent to the creation of a pledge the pledgee's ability to inflict an oppressive bargain upon the pledgor is greatly diminished although not wholly absent." See also, Wagner v. Phillips, 78 N.J. Eq. 33, 36 (Ch. 1910); McKlosky v. Kubylarz, supra; Smith v. Shattls, supra; 4 American Law of Property, § 16.62 at 115.

IV
The above rules, one of which applies to options taken as a part of original mortgage transactions and the other which applies to options taken at a subsequent time, are both clearly indicative of the jealousy with which courts guard mortgagors. Normally they are applied to conventional mortgagees. Here Humble was not a conventional mortgagee since it did not lend its own funds to the Rokitas. The question, then, is to what extent do the above rules apply to the option in Humble's hands?
First, it is my conclusion on the facts of this case that the anti-clogging rule applies fully to Humble and that the option is absolutely void in its hands, regardless of actual fairness or oppression, just as it would be in the hands of any regular mortgagee.
Although perhaps not a guarantor to the bank for the Rokitas in the technical sense, it is clear that Humble's position was closely akin to that. Without question, it was in the position here where it could and did determine exactly how it would participate in this transaction. Rather than making a direct guaranty to the bank, it chose to enter into a lease in order that the rental payments which it promised to pay thereunder to the Rokitas could be assigned to the bank. This arrangement avoided a direct obligation by it to the bank and gave it an "out" if the Rokitas failed to perform their obligations under the lease and sublease back. It also gave it full security in the leased property to recoup *551 any payment which it might choose to make to the bank and any expenditure which it might incur in connection therewith. It had the right to repay itself such sums either by withholding rent payments or by requiring the Rokitas to pay said sums directly to it with interest, and it had the right to extend the lease so long as any sums remained outstanding. It also had the right to cancel out the sublease and enter into possession in the event of a default. In this sense the lease transaction was an equitable mortgage and Humble was itself a mortgagee. It is clear that equity looks to substance rather than to form, and that a guarantor or surety who takes property or an interest therein as security for his guaranty is a mortgagee thereof in equity. See Martin v. Bowen, 51 N.J. Eq. 452 (Ch. 1893); Meeker v. Warren, 66 N.J. Eq. 146 (Ch. 1904); Maginn v. Cashin, 196 Mich. 221, 162 N.W. 1009 (Sup. Ct. 1917); Dubois v. Bowles, 55 Colo. 312, 134 P. 112 (Sup. Ct. 1913); Schelling v. Thomas, 96 Cal. App. 682, 274 P. 755 (D. Ct. App. 1929); Dudley v. Buckley, 68 W. Va. 630, 70 S.E. 376 (Sup. Ct. App. 1911); Frazier v. Frazier, 282 Ky. 405, 138 S.W.2d 506 (Ct. App. 1940). The option was therefore a clog on the Rokitas' right to redeem from Humble as an equitable mortgagee.
Moreover, Humble had the option under the lease, in the event of a mortgage default by the Rokitas and an acceleration by the bank, to step into the bank's shoes as regular mortgagee. Because of the nature of the transaction it would have been entitled to full rights of subrogation upon payment to the bank. Restatement, Security, § 141; 83 C.J.S., Subrogation, § 47a at 667. There was therefore a real possibility, in the event of a default, that it would become the regular mortgagee in the place of the bank.
In addition, as indicated above, under the note agreement executed in connection with the permanent mortgage the Rokitas expressly agreed that, in the event they failed to comply with any of the "terms, promises, covenants and agreements" contained in the lease with Humble, the bank *552 should have the right to accelerate the entire balance due on the mortgage debt and, at its option, sue for said balance or foreclose the mortgage. One of the terms and agreements contained in the lease was the option itself. Performance of the option was therefore required by the mortgage note itself, and the bank as mortgagee, as well as Humble, had some powers of enforcement. It was Humble, not the Rokitas, which had a prior relationship with the bank and brought it into this transaction. Humble was therefore not simply an isloated guarantor, and the option was an integral part of the overall mortgage transaction in which Humble was a direct participant. Unico v. Owen, 50 N.J. 101, 112-113, 122-123 (1967).
Furthermore, it is clear that Humble was the dominant party in the transaction. Humble volunteered its participation and it was Humble's power and position which caused the loan transaction to come into being. It dictated the terms of the loan and offered them to the Rokitas on a "take it or leave it" basis. Its standard printed forms were used. It, rather than the bank, insisted upon the option. It was therefore the party which was in the position to "exact severe terms" and "concessions" from the Rokitas as debtors. See cases cited in Point III, supra.
Finally, it is clear that this was strictly a loan transaction. Regardless of Humble's business motives for entering into it, cf. Esso Petroleum Co., Ltd. v. Harpers Garage (Stoweport) Ltd., [1968] A.C. 269, the Rokitas were bargaining for a loan and nothing more. Humble never owned a prior interest in the property and was not a joint venturer with the Rokitas in the development of the station. The lease was what is known in the trade as a "two-party" lease rather than a "three-party" lease.[1] It was created solely as a security *553 device in connection with a mortgage loan and it was never intended that Humble should actually enter into possession of the property, or run the business, or invest any of its own funds in the premises. There was therefore no special reason or justification for demanding an option here  it was simply a price demanded by Humble for lending credit which permitted the loan transaction to come into being.
In these circumstances all the policy reasons behind the anti-clogging rule, applicable to mortgagees in general, apply to Humble here with full vigor. Since this is so, the option is void without necessity of inquiry as to whether or not it was unfair or oppressive.
The application of the above rule disposes of the case. If for some reason, however, it should be concluded that, because Humble was a guarantor and a lessee rather than a conventional mortgagee, the ordinary flat prohibition against clogging options should not apply to Humble, it is my opinion that, at the very least, the rule requiring close scrutiny *554 and proof of fairness would be applicable. Under such rule, the option fails to pass muster and it cannot be enforced. Although, as indicated above, Humble was not guilty of actual fraud and, when tested by conventional rules, the option could not be set aside for inadequacy of consideration, a different result is reached when it is scrutinized as an integral part of a mortgage transaction under the above equitable rule. In the eyes of equity it is in fact unconscionable and oppressive.
This is not a case involving a fair bargain between persons negotiating on equal terms, the evasion of which under the anti-clogging rule caused the House of Lords some concern in the Samuel case. Humble's use of its dominant bargain power is very evident. Some of the facts in this regard have already been referred to. Humble had its own ends to be gained by the transaction. Although the leases and option were entered into by the Rokitas solely in consideration of a loan, the form of the transaction was advantageous to Humble because it guaranteed to it an outlet for its products for at least 15 years, with the likelihood that there would be no capital outlay by it at all, but with the security of the property provided to it if any expenditures by it were required. The option gave it the additional right to buy the property and take over the business for a fixed sum if that proved favorable to it. So far as the Rokitas were concerned, the whole purpose of the loan was to build up and improve the business and property for their own benefit and enjoyment and not that of Humble, but the option was completely antithetical to that purpose. By it they surrendered to Humble not only the right to determine whether and when there should be a sale, with all the consequences thereof, including possible income tax consequences to them, but also the right to take for itself, to their complete exclusion, the fruits of any increase in value over the price fixed in the option. The option was not a right of first refusal or one to pay current market value. It is clear from Alden's testimony and from the fact that the fixed price option was included *555 as a printed clause in its standard form of lease that Humble's company policy was to insist upon such a fixed price option in its leases. By taking such option here, Humble put itself in the fortunate position where it had nothing to lose and much to gain  it was not obliged to do anything but it could exercise the option if the value of the property increased sufficiently over the option price to make it financially worthwhile to do so. The Rokitas could only lose  the harder they worked to build up the business, and the more the property increased in value, the more it was in the interest of Humble to exercise the option. Cf. Esso Petroleum Co., Ltd. v. Harper's Garage (Stoweport) Ltd., supra; Shell Oil Co. v. Marinello, 120 N.J. Super. 357 (Law Div. 1972) certif. granted 62 N.J. 186 (1973). A long-term fixed-price option, exercisable solely at the will of the optionee, is obviously a questionable thing from an optionor's point of view in any circumstances. When one considers that this option was required as the price for favorable mortgage loan terms and that Humble insists upon enforcing it in accordance with its terms, although it concedes that the property is worth at least $90,000 more than the option price, "[a]n instinctively felt sense of justice cries out against such a sharp bargain." Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 388 (1960).
Moreover, although, as I have stated, I do not believe that Alden actually made misrepresentations to the Rokitas concerning the option, I am satisfied from the testimony that the matter was presented by him to them with accent on the fact that they were being accommodated by Humble for their benefit and without emphasis on the burdens imposed by the option. The casual way in which the option price was fixed, according to Alden's own testimony, tends to support this. Alden stated that Humble never had the property appraised in 1958 and that the price was not determined until the last conference when the lease was signed on September 5, 1958, and it was entered in ink in the lease at that time. He said that he first suggested $50,000 more or less as a *556 "joke," then $100,000 which the Rokitas declined to go along with, and then $150,000 which they agreed to. There was no suggestion from Humble that the Rokitas reflect on the price or get independent advice. Although Alden did not tell them that they should not consult an attorney, there is no evidence that it was ever suggested that they have one, and it is clear that they in fact did not have the benefit of legal advice. Alden knew that Mrs. Rokita had stated that she did not want to sell, but there is no evidence that he spelled out for them in detail all the ramifications of their obligations under the option. As indicated by a receipt signed by Victor and by Alden, Humble did not deliver the signed copy of the original lease to them until May 25, 1959, almost eight months after it was signed, and only several days before the construction mortgage transaction was finalized, and about two weeks after they signed the written statement for the bank stating that the option was "satisfactory."
The conclusion is irresistable that the Rokitas, anxious to get the loan, went along, perhaps not realizing the effect of the option which they signed until too late, but, in any event, hoping and trusting that Humble would not exercise the option. They misrelied on the "mirage of hope" (4 American Law of Property, § 16.59, supra), and jumped at the favorable loan terms which Humble dangled in front of them, even though it was a bad bargain for them.
There were other terms and conditions of the loan transaction which were unfavorable to the Rokitas and which demonstrate that Humble was in a position to take advantage of them. From the point of view of the owner, it is essential to a two-party lease transaction entered into for security purposes that there be a lease back to the owner or his nominee at the same or a comparable rental. The transaction is intended to be a wash transaction. Here the monthly rental fixed in the original lease to Humble, though fair and equitable if part of a two-party lease transaction for collateral purposes with a lease back, was definitely inadequate *557 and unconscionable if there was no obligation to lease back to the Rokitas and if, as in the normal three-party lease transaction, Humble could retain possession or sublet to a third party of its own choosing. The rental which Humble agreed to pay was only the amount which the Rokitas were required to pay to the bank as principal and interest on the mortgage loan. The Rokitas were obliged under the terms of the lease to pay all other costs of maintaining the property, including taxes and assessments, insurance and the cost of repairs. They expressly agreed at their cost and expense to keep the service station well painted in accordance with Humble's specifications at all times and to keep it in repair and, if they failed to do so, Humble could either cancel the lease or make such expenditures for their account and collect from them with interest, directly or by withholding rent monies. These costs obviously were greatly in excess of the amount of rent which Humble agreed to pay under the lease and, if there were no obligation to lease back the premises so that the Rokitas could earn necessary funds from the operation of the business, Josephine would have leased her property to Humble for 15 years for only a fraction of a fair return thereon and for much less than necessary to carry it.
Despite this, there was nothing in writing in the original lease to Humble signed in 1958 which indicates that this was a two-party lease transaction with an obligation upon Humble to lease back to the Rokitas or their nominee. Indeed, the contrary is true. Paragraph 7 of the original lease expressly provided that "Lessee [i.e. Humble] may sublet all or any part of the premises but no such subletting shall release the lessee from its obligations hereunder."
It was not until January 18, 1960, almost 1 1/2 years after the original lease was signed and about a week after the permanent mortgage papers were signed, that a written sublease to Victor was executed by Humble. From that date to the present Humble has in fact leased back to Josephine's nominees, first to Victor and then to the corporation of *558 which Josephine's brother was the president. The written subleases were on identical Humble forms. Neither was for a 15-year term; each ran for one year and from year to year thereafter, with the right in Humble to terminate at the end of any year, apparently without regard to whether the sublessee was in default. Each sublease provided that the sublessee agreed not to assign the lease or sublet the premises. The subleases therefore contained nothing in writing which recognized Josephine's right to a sublease coextensive with the original lease, and in fact that they were not coextensive with it.
The testimony of Alden showed the unfavorable position in which Josephine was placed. He admitted that part of the original arrangement agreed to in September 1958 was oral and at first stated that he told the Rokitas then that there would be a lease back and that they would continue to operate the station. When pressed on cross-examination as to the meaning of paragraph 7 of the original lease, however, he testified that he told the Rokitas in 1958, "like the lease says," that Humble "could sublet to anyone we wanted." He insisted that he told Josephine that she had nothing to say about that and that Humble could pick the tenant. He also stated that he made it clear to them orally in 1958 that the lease back would not be for a 15-year term but would be for a one year term and from year to year thereafter, and that Humble would have the right to terminate at the end of each year regardless of default.
I have a suspicion that Alden, testifying many years after the event, was merely rationalizing from documents and was not stating from personal recollection what was actually discussed and agreed upon by the parties in 1958. He professed to be doing so, however, and Humble is bound by his testimony. In any event, the lease and the subleases do contain the provisions summarized above which are inconsistent with Josephine's rights under a fair two-party lease arrangement. It is perfectly obvious that for the first 1 1/2 years Josephine had nothing in writing to prove her right to a *559 lease back and that she would have been compelled, in the event of a dispute with Humble, to rely on oral testimony and her own memory of terms agreed to. Even after the written subleases were entered into, if Humble had cancelled at the end of any year and declined to sublet to her or her nominee, she would have been in the same position and, indeed, would have been faced with the claim, as she was at this trial, that Humble had the right to cancel out regardless of default and to pick its own tenant. It is crystal clear that, considering the amount of rent fixed in the original lease and the underlying purpose of the transaction, a fair bargain would require a firm and acknowledged obligation on the part of Humble in writing as a part of the original transaction in 1958 to lease back to Josephine or her nominee for the full 15-year period of the original lease at the same rent in the absence of a default. The lease and subleases did not spell this out and Josephine was at the mercy of Humble.
Under the alternate rule, if applied here, therefore, the option is unenforcible because close scrutiny shows that the transaction is unfair, inequitable and oppressive. See Barr v. Granahan, supra; see Williams, "Clogging the Equity of Redemption," 40 W. Va. L.Q. 31 (1933), and authorities cited above.

V
In concluding, several additional points should be noted.
In the first place, this is not a holding that all options granted to oil companies in service station leases are invalid. As pointed out above, there are many differences between two-party lease and three-party lease transactions and, quite clearly, different considerations may come into play in passing upon the validity of options given in connection with three-party leases. Different rules may also apply where an oil company is a true joint venturer with the ownerlessor or where it started out as the owner of the property *560 and the option to buy was taken by it in connection with a sale by it to the optionor and the transaction is therefore a sale with an option to repurchase. See MacArthur v. North Palm Beach Utilities, Inc., 202 So.2d 181 (Fla. Sup. Ct. 1967), rev'g 187 So.2d 681 (D. Ct. App. 1966); Pomeroy, op. cit., §§ 1194-1195 at 573 et seq. There are also obvious differences between fixed sum options and rights of first refusal. This decision is based upon the facts of this case.
Second, as stated at the outset of this opinion, neither in cases involving service station leases nor in decisions involving other types of transactions were any holdings found which dealt specifically with the application of anti-clogging rules to options taken as a part of original mortgage transactions by guarantors or other participants as distinguished from regular mortgagees. There are a number of cases involving options taken by oil companies in connection with service station leases, but they provide little guidance in the decision of this case.
In the majority of those cases the options were held specifically enforcible by the oil companies, and in some of them conventional rules were applied to the effect that options to purchase for fixed sums are not voided merely because of a subsequent enhancement in the value of the property. See Shell Oil Company v. Boyer, 234 Or. 270, 381 P.2d 494 (Sup. Ct. 1963); Gulf Oil Corp. v. Clark, 169 F. Supp. 717 (D. Md. 1959); aff'd 273 F.2d 195 (4 Cir.1959); Cities Service Oil Co. v. Viering, 404 Ill. 538, 89 N.E.2d 392 (Sup. Ct. 1950); Sinclair Refining Co. v. Clay, 102 F. Supp. 732 (N.D. Ohio 1951), aff'd 194 F.2d 532 (6 Cir.1952); Texas Co. v. Crown Petroleum Corp., 137 Conn. 217, 75 A.2d 499 (Sup. Ct. Err., 1950); Sinclair Refining Co. v. Miller, 106 F. Supp. 881 (D. Neb. 1952); Glenn v. Tide Water Associated Oil Co., 34 Del. Ch. 198, 101 A.2d 339 (Ch. 1953); Sinclair Refining Co. v. Allbritton, 147 Tex. 468, 218 S.W.2d 185 (Sup. Ct. 1949); Rice v. Sinclair Refining Co., 256 Ala. 565, 56 So. 2d 647 *561 (Sup. Ct. 1952); Shell Oil Co. v. Kapler, 235 Minn. 292, 50 N.W.2d 707 (Sup. Ct. 1951); Humble Oil & Refining Co. v. Lennon, 94 R.I. 509, 182 A.2d 306 (Sup. Ct. 1962), cited supra; Gulf Oil Corp. v. Rybicki, 102 N.H. 51, 149 A.2d 877 (Sup. Ct. 1959); Gulf Oil Corp. v. Montanaro, 94 N.J. Super. 348 (Ch. Div. 1967) cited supra. In other service station cases specific performance was denied. See Texas Co. v. Andres, 97 F. Supp. 454 (D. Idaho 1951); Sinclair Refining Co. v. Martin, 38 Tenn. App. 66, 270 S.W.2d 576 (Ct. App. 1954); Shell Oil Co. v. Blumberg, 154 F.2d 251 (5 Cir.1946); Texaco, Inc. v. Rogow, 150 Conn. 401, 190 A.2d 48 (Sup. Ct. Err., 1963).
None of the above cases is a persuasive precedent here. All are distinguishable on their facts, for one reason or another, involving, as they do, three-party leases or other types of transactions, different types of options such as rights of first refusal, or other points of difference. None of the above cases involved a two-party lease transaction for collateral purposes. In none were the anti-clogging rules related to mortgage transactions discussed, applied or rejected.
Only one reported case was found which involved a two-party lease transaction. Cunningham v. Esso Standard Oil Co., 35 Del. Ch. 371, 118 A.2d 611 (Sup. Ct. 1955), aff'g 35 Del. Ch. 210, 114 A.2d 380 (Ch. 1955), involved an action for specific performance of a fixed price option taken by Esso in a two-party lease transaction. There in 1940 a Mr. Spath, representing Esso, approached defendant, who was then operating a service station under a rental arrangement with another major oil company, and suggested to him that he was wasting his time and should acquire his own station and build up an equity in it. Defendant indicated his interest and Esso then went out and acquired an option to buy certain land for $8,500. It assigned the option to defendant, who paid $2,000 toward the purchase price and a $6,500 mortgage provided the balance. Defendant needed further financial assistance to build the station, and a mortgage *562 of $13,000 was obtained and the prior mortgage was paid off. To secure the new mortgage a two-party lease was arranged much like that here involved. Defendant leased the property to Esso for ten years with an option to renew for five successive one-year periods. The rental payments from Esso were assigned to the mortgagee as additional security. Esso sublet the property to defendant at the same rental. This sublease was for one year only, with provision for renewal from year to year unless terminated by either party.
In the original lease Esso was given the option to purchase the property for $20,000 at any time during the term of the lease. Approximately 14 years thereafter Esso exercised its option. It was established that the property was worth approximately $18,000 when the option was given but had a value of approximately $73,000 when the option was exercised. It was further established that when the original lease was prepared by Esso and given to defendant, he took it to his attorney and they went over it paragraph by paragraph. The attorney took exception to the provision for the option and defendant went back to Spath and objected to it. Spath apparently told defendant that Esso was not in the real estate business, that it wanted independent dealers, and that upon expiration of the lease Esso would more than likely want an extension. Defendant then signed the lease contrary to his attorney's advice.
The Supreme Court of Delaware affirmed the decision of the Court of Chancery granting specific performance in favor of Esso. Both courts held that Spath's assurances to the defendant, although probably causing him to believe that Esso would not exercise the option, fell short of fraud and that, having had the benefit of legal advice and having signed the lease despite it, defendant was bound thereby.
The Cunningham case may be distinguished on a number of grounds. One obvious distinction is that in that case defendant had the benefit of timely legal advice and ignored it. It is clear that both Delaware courts felt that this was *563 a compelling reason for enforcing the option. Another basis for distinction is that in Cunningham, unlike the situation here, the oil compay for all practical purposes owned the property to start with. Cf. Mac Arthur v. North Palm Beach Utilities, Inc., supra.
The main basis for distinction, however, is that there is no indication at all that the argument was made to either the Supreme Court of Delaware or the Court of Chancery that the anti-clogging rules applicable to mortgage transactions were controlling or had any bearing. There is no evidence at all that these rules were considered, and certainly there was no determination that they were not valid or not applicable. It may be noted that the Court of Chancery held in Cunningham that defendant had been "outbargained" (114 A.2d at 384), and the Supreme Court of Delaware expressed sympathy for defendant and stated that he had acted "imprudently" and that "[t]he almost irresistable inference from all this is that Cunningham concluded, in effect, to take the chance of the option being exercised, believing it would not be exercised." (118 A.2d at 613). The very purpose of the anti-clogging rules, based upon strong public policy, is to prevent mortgagors from being "outbargained" in mortgage transactions and to protect them from the consequences of their acts done through infirmity of will because of their inferior bargaining positions. Had these rules been considered in Cunningham, the result might well have been different. In any event, the decision is not a precedent against the application of these rules which I deem controlling here.
Although the result in this case is arrived at by application of ancient rules relating to mortgages, it may be noted that these rules are in harmony with modern decisions which deal with somewhat similar problems and apply the same underlying considerations of public policy. Indeed, these ancient rules provide precedents from which the modern decisions flow. See Henningsen v. Bloomfield Motors, Inc., supra; Unico v. Owen, supra; Reste Realty Corporation v. *564 Cooper, 53 N.J. 444, 451-454 (1969); Shell Oil Co. v. Marinello, supra, 120 N.J. Super. 357 at 372-378; Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 552-556 (1967). As stated by our Supreme Court in Dobbs:
The perimeter of public policy is an ever increasing one. Although courts continue to recognize that persons should not be unnecessarily restricted in their freedom to contract, there is an increasing willingness to invalidate unconscionable contractual provisions which clearly tend to injure the public in some way. [at 554]
In United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 599, 86 L.Ed. 855, 876 (1942), the late Mr. Justice Frankfurter said:
* * * It is said that familiar principles would be outraged if Bethlehem were denied recovery on these contracts. But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?
These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a "bargain" in which one party has unjustly taken advantage of the economic necessities of the other. "And there is great reason and justice in this rule, for necessitous men are not, truly speaking, free men, but, to answer a present exigency, will submit to any terms that the crafty may impose upon them." Vernon v. Bethell, 2 Eden 110, 113, 28 Eng. Reprint 838. [315 U.S. at 326, 62 S.Ct. at 599]
The above holding has been relied upon in the modern cases which have struck down unconscionable contractual provisions, including Henningsen and Unico. Far from being a new or radical departure from existing law, as Justice Frankfurter stated in his opinion, it is drawn from and *565 supported by the fundamental principles expressed "in an almost infinite variety of cases," including the ancient rules relating to mortgages involved here. 315 U.S. at 327-330, 62 S.Ct. at 600, 86 L.Ed. at 877-879. My decision here is supported by both the ancient and modern application of the rules.
Other contentions advanced by Humble by way of defense to Josephine's counterclaim and in reply to her affirmative defenses, including the claim that she cannot prevail because of laches, are without merit. The option is unenforcible and Humble is entitled to neither specific performance nor damages.
NOTES
[1] Although each term may encompass more than one type of transaction, the normal "two-party" lease is one in which the owner leases a station, which he himself builds or has previously built, to an oil company for a specified rental and the oil company leases it back to him or his nominee at the same rental. This is simply a security transaction to aid the owner in obtaining mortgage financing. It is not intended that the oil company take possession or run the business. The amount of rental fixed in both the lease to the oil company and the sublease back is normally unimportant to either the owner or the oil company since it is intended as a wash transaction  in effect the oil company pays to the mortgagee the money paid to it by the owner under the sublease and all monies come from the business which the owner, not the oil company, owns and operates.

In "three-party" leases there are normally at least three parties and there is no lease-back to the owner. The owner leases to the oil company with the idea that the company will operate the station itself or sublet it to a third person. In some cases the land is completely vacant when it is leased to the oil company and the station is built by the company or its sublessee. In any event, the owner is normally an "absentee" owner, not actively participating in or responsible for the operation of the business, and the amount of rental paid to him by the oil company is most important to him, being his sole return on the property. The oil company normally participates in or is responsible for the operation and growth of the business and either its own or its sublessee's money is invested in the business. Such leases are not normally entered into primarily to aid in mortgage financing by the owner.