*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RA2 TROY LLC,

Plaintiff-Appellant,

v

F1 135 TROY LLC, and ICA
ACQUISITION TROY, LLC,

Defendants-Appellees.

UNPUBLISHED
June 15, 2023

No. 362023
Oakland Circuit Court
LC No. 2021-189427-CB

and

RA2 BATTLE CREEK LLC, and AUBSP
OWERCO 13, LLC,

Plaintiffs-Appellants,

v

FI 135 BATTLE CREEK, LLC, and ICA
ACQUISITION BATTLE CREEK, LLC,

Defendants-Appellees.

No. 362572
Calhoun Circuit Court
LC No. 2021-002196-CB

Before: SWARTZLE, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

-1-

## I. BACKGROUND

In these consolidated cases,[1] plaintiffs appeal as of right orders granting summary disposition in favor of defendants in these commercial real estate actions arising from the default of loans that resulted in the forfeiture of the underlying real properties. We affirm.

In 1998, plaintiffs RA2 Troy, LLC and RA2 Battle Creek, LLC (collectively referred to as plaintiffs) acquired real property located in Troy and Battle Creek, Michigan.[2] Plaintiffs financed their multi-million-dollar purchases by entering into loan agreements with PW Real Estate Investments, Inc. (referred to as PW Real Estate).[3] The loans were secured by mortgages on the real properties. The loans were scheduled to mature in September 2020, at which time plaintiffs were to make balloon payments to pay off the loans.

As a precondition for PW Real Estate to make the loans to plaintiffs, according to Section 2.02(r) of the loan agreements, PW Real Estate was to receive a residual value insurance (RVI) policy issued by Financial Structures Limited (FSL) "in amount, form and substance and with reinsurance agreements and endorsements reasonably satisfactory to" PW Real Estate. As plaintiffs explained in their complaints, "[r]esidual value insurance ("RVI") is a risk management tool that asset-based lenders sometimes use to manage the risk that their collateral will depreciate faster than projected or will unexpectedly decline in value as a result of unexpected macroeconomic forces or other events and causes, such as, for example, a global pandemic." Under both RVI policies, plaintiffs were the "Named Insured" and PW Real Estate was the "Additional Named Insured." The "Insured Value" of RA2 Troy's property was $1,785,457 and the premium paid for the policy was $74,418. The "Insured Value" of RA2 Battle Creek's property was $941,741 and the premium paid for the policy was $40,670.

The purpose of the RVI policies was to ensure payment of the balloon payments that were due on each plaintiff's loan upon maturity. However, if plaintiffs failed to pay the loans upon maturity, the terms of the RVI policies provided that PW Real Estate, as the Additional Named Insured, could submit a notice of claim to FSL for an amount up to the Insured Value. As stated in Article V(a) and (d) of the RVI policy, upon receipt of the notice of claim from PW Real Estate (or its successor-in-interest), FSL could either pay the claim or purchase the loan from PW Real Estate "for a purchase price equal to all amounts payable under the Loan, but in no event greater than the Insured Value." Pursuant to Paragraph 8 of the Additional Named Insured Endorsement which was part of the RVI policy, if FSL paid the claim, the Additional Named Insured "agrees to

---

[1] See *RA2 Troy, LLC v FI 135 Troy, LLC*, unpublished order of the Court of Appeals, entered September 21, 2022 (Docket Nos. 362023, 362572).

[2] While AUBSP Ownerco 13, LLC is listed as a plaintiff in the Calhoun Circuit Court matter, its affiliation is unclear. It was not named as a plaintiff in the complaint or in the insuring documents at issue in this case.

[3] It appears that RA2 Troy's loan was for $4,298,968.26 and RA2 Battle Creek's loan was for $3,108,703.28.

promptly assign to [FSL] (or its designee), without recourse, the Note, the Mortgage and all other documents relating to the Loan . . . ."

As a condition for issuing an RVI policy, however, FSL required that plaintiffs enter into Insured Covenant (IC) Agreements. As stated in Paragraph 6 of the Recitals provision of the IC Agreements, plaintiffs agreed that if FSL makes payment in full to the Additional Named Insured (PW Real Estate or its successor-in-interest) pursuant to the RVI policies, the real properties that were subject to the defaulted loans "will immediately be transferred to FSL for no additional consideration other than such payment to the Additional Named Insured pursuant to the Policy."

Further, Paragraph 4(a) of the IC Agreements, titled "Transfer of Title," stated that if FSL makes payment for a claim made by the Additional Named Insured (PW Real Estate), the deeds to the real properties were to be immediately delivered to FSL, without payment of additional consideration by FSL. Plaintiffs also acknowledged that payment by FSL under their RVI policies was "the equivalent of a purchase of the Property by FSL for an amount equal to the amount paid under the Policy and used in satisfying all or part of [plaintiffs'] obligations under the Note[s], and that such payment constitutes full and fair consideration for the transfer of title to the Property to FSL." And Paragraph 5(i) of the IC Agreements, titled "Representations, Warranties and Covenants of Owner," stated that each plaintiff, as owner, "certifies, represents, warrants and covenants to FSL" that they had "received the advice of counsel concerning each and all of the terms, conditions, limitations and exclusions of the Policy."

It is undisputed that when plaintiffs' loans matured in September 2020 and balloon payments were due to be paid by plaintiffs, plaintiffs did not make the payments. Therefore, the successor-in-interest to PW Real Estate, U.S. Bank National Association, delivered a notice of claim to FSL pursuant to the terms of the RVI policies with regard to each plaintiff's outstanding loan. Plaintiffs concede that FSL paid the claims for the Insured Values due on the properties.

Thereafter, as required under Paragraph 8 of the Additional Named Insured Endorsement, the Note, the Mortgage and all other documents relating to the loans were assigned from PW Real Estate, to a designee of FSL, and then to defendants FI 135 Troy, LLC and FI 135 Battle Creek, LLC. Plaintiffs were later sent demand letters in July 2021 from defendants FI 135 Troy and FI 135 Battle Creek stating that their loans were in default and payments were demanded. The claimed balance due from RA2 Troy was $1,637,428.55 and the claimed balance due from RA2 Battle Creek was $819,334.12.

FSL had also assigned its rights under the IC Agreements, including the right to demand the transfer of titles to the real properties at issue—as stated in Recitals Paragraph 6 and Transfer of Title Paragraph 4(a) of the IC Agreement—to defendant ICA Acquisition Troy, LLC and defendant ICA Acquisition Battle Creek, LLC. Consequently, in August 2021 defendants ICA Acquisition Troy and ICA Acquisition Battle Creek sent plaintiffs notices of default and demands for the deeds to the real properties at issue as set forth in the IC Agreements entered into by plaintiffs.

Shortly after the demand notices were sent, on August 9, 2021, plaintiffs filed these lawsuits. In Count I of plaintiffs' complaints, they sought declaratory judgments holding, in relevant part, that their loans secured by the mortgage instruments were paid in full and satisfied

when FSL paid the claims made pursuant to the RVI Policy; thus, defendants acquired no valid indebtedness or lien rights against plaintiffs or the real property. And, further, the IC Agreements' forfeiture provisions were void because they "clogged" plaintiffs' rights to redeem the properties following mortgage loan defaults. In Count II, plaintiffs raised breach of contract claims, alleging that FSL breached the RVI Policies by failing to obtain appraisals of the properties as required under Article IV of the RVI Policy.

Defendants filed motions for summary disposition under MCR 2.116(C)(10), arguing that plaintiffs' frivolous lawsuits were merely attempts to preempt defendants' plain and unambiguous contractual rights set forth in the RVI Policies and IC Agreements. First, defendants argued that plaintiffs were not entitled to declaratory relief and Count I should be dismissed because defendants acquired their rights through proper assignments consistent with the terms of the contracts at issue and those contracts did not "clog" any rights of redemption. In particular, defendants ICA Acquisition argued, their rights to the properties at issue arise from the IC Agreements that plaintiffs entered into—not through foreclosure actions that gave rise to rights of redemption. Further, the IC Agreements were supported by consideration apart from the mortgages, i.e., payment of a notice of claim by FSL to plaintiffs' lenders pursuant to the RVI Policy, which plaintiffs acknowledged—in the IC Agreement—was the equivalent of a purchase of the property by FSL. And defendants FI 135 argued that they were merely enforcing their rights under the loan documents. The fact that FSL paid the Insured Value to plaintiffs' lenders after they filed a claim under the RVI Policy did not "retire" any of the loan documents or plaintiffs' obligations under those loan documents—as plainly stated in the RVI Policy.[4] And any such argument to the contrary is absurd, defendants argued, considering that plaintiff RA2 Troy paid a premium of $74,418 for the RVI Policy and RA2 Battle Creek paid a premium of $40,670 for the RVI Policy. Second, defendants argued, plaintiffs' breach of contract claims must be dismissed because there was no requirement in the RVI Policy that FSL obtain appraisals of the properties before plaintiffs' became obligated to (1) pay their loans and, if they failed to do so and FSL paid a claim to their lenders, (2) transfer title to the properties under the IC Agreements. Accordingly, defendants argued that plaintiffs' complaints must be summarily dismissed.

Plaintiffs opposed defendants' motions for summary disposition and sought summary disposition under MCR 2.116(I)(2). Plaintiffs argued that once the lender's claims were paid by FSL upon plaintiffs' defaults, pursuant to the RVI Policies, the loans were satisfied and plaintiffs owed nothing on the properties. Therefore, the FI 135 defendants' demands for payment of the balances due on the loans, following assignment by the lender, were not proper because plaintiffs owed nothing on those loans—the mortgages were paid off by FSL via the insurance claim proceeds. Further, the ICA Acquisition defendants' demands for the deeds to the properties, following assignment of the IC Agreements by FSL, were not proper because plaintiffs would be required to forfeit all of their equity in those properties, despite having paid a significant amount of the principals on the original loans. Accordingly, plaintiffs argued, the insurance claim proceeds

---

[4] Defendants noted in their motions for summary disposition that defendants FI 135 and defendants ICA Acquisition entered into subordination agreements to avoid conflict with respect to their respective rights regarding the properties. Defendants FI 135 subordinated their lien rights to the ICA Acquisition defendants' rights under the IC Agreements.

-4-

satisfied their loans and the IC Agreements were unenforceable and void as a matter of law because such agreements violate the doctrine against clogging the right to redemption inherent in every mortgage loan transaction. Plaintiffs argued that a borrower's equitable right to redeem property is sacrosanct and exists even if the lender does not seek foreclosure of the mortgage loan through formal proceedings. In other words, any agreement that "clogs" the right of redemption is void and unenforceable. Accordingly, plaintiffs argued that they were entitled to summary disposition, not defendants.

Defendants filed reply briefs in support of their motions for summary disposition, arguing that the payment of the claim to plaintiffs' lender pursuant to the RVI Policy did not discharge plaintiffs' obligations under the loan documents. By explicit language in that policy, the notes, mortgages, and related documents were then to be assigned from the lender to FSL or its designee—eventually the FI 135 defendants. Indeed, the RVI Policy is insurance that protects the lender, not the borrower, as it explicitly states. Further, the IC Agreements were not void as a clog on the equity of redemption because the ICA Acquisition defendants' rights under those agreements do not arise through foreclosure; rather, their rights arise by FSL's payment of a claim under the RVI Policy, not plaintiffs' default under the mortgage. Moreover, defendants argued, the IC Agreements were not part of the original mortgage transactions—they were entered into later in a separate transaction and they involved a different party—FSL—not plaintiffs' lender. In other words, there was no mortgagor /mortgagee relationship; therefore, the "clogging" doctrine is not applicable.

Ultimately, defendants' motions for summary disposition were granted and both of plaintiffs' complaints were dismissed. On April 28, 2022, the Oakland Circuit trial court issued a well-reasoned 25-page opinion and order which, first, held that the RA2 Troy plaintiff's argument that FSL's payment to the lender served to pay off the loan balance was not supported by the unambiguous provisions of the RVI Policy—in particular, Article V(a)—and the Additional Named Insured Endorsement—in particular, Section 8. The trial court held, in relevant part:

> First, contrary to the Plaintiff's argument, Article V(a) does not state that if a claim is made, the Insurer's payment to the Lender will be used to pay off the loan. Article V(a) merely states that upon valid notice of a claim, the Insurer will pay the Insured Value to the Additional Named Insured (the Lender). Further, Section 8 of the Additional Named Insured Endorsement unambiguously provides for assignment of the Mortgage Instruments upon payment of a claim by the Insurer. Thus, the consideration for the payment by the Insured of a claim made by the Additional Named Insured is not, as the Plaintiff argues, the payoff of the Loan but rather it is the assignment of the loan documents to the Insurer.

Second, the trial court held that the IC Agreement—in particular, Section 4(a)—was enforceable and did not impermissibly clog plaintiffs' equity of redemption. The court noted that the prohibition against clogging the equitable right of redemption has only been applied in the context of a mortgagor/mortgagee relationship and the IC Agreement at issue here was not between plaintiff (mortgagor) and the lender (mortgagee). And, moreover, the court noted, a party may sell its equity right of redemption through a contract that is separate and distinct from the mortgage agreement and the IC Agreement was such an agreement, and it was entered into in good faith and for consideration. Accordingly, the trial court dismissed Count I of the RA2 Troy plaintiff's

complaint seeking declaratory relief. The trial court also dismissed Count II of the RA2 Troy plaintiff's complaint holding, in pertinent part, that the RVI Policy did not require defendants to obtain an appraisal before the loan documents were subject to assignment upon payment of a claim; thus, plaintiff could not establish a breach of contact claim. Therefore, plaintiff's case was dismissed in its entirety. On June 24, 2022, the trial court issued an opinion and order denying the RA2 Troy plaintiff's motion for reconsideration.

On July 13, 2022, the Calhoun Circuit trial court heard oral arguments on defendants' motion for summary disposition of the RA2 Battle Creek plaintiff's complaint—which was substantially the same as the RA2 Troy plaintiff's complaint. Defendants' motion raised substantially the same arguments in support of summary dismissal as were raised in the Oakland Circuit case. The Calhoun Circuit trial court referenced the dismissal opinion and order rendered by the Oakland Circuit trial court and agreed with the findings and conclusions. Notably, the court agreed that the "clogging" doctrine was inapplicable because it pertains to mortgagor/mortgagee relationships which did not exist in this case. Instead, this case involved separate, distinct agreements between different and sophisticated business entities. Further, FSL's payment of the insurance claim made under the RVI Policy—as it clearly stated—did not extinguish the obligations plaintiff owed under the loan documents. Plainly stated, plaintiff had no rights at all under the RVI Policy. Moreover, the IC Agreement clearly stated that if a claim was, in fact, paid by FSL under the RVI Policy, the property was to immediately be transferred to FSL for no additional consideration. And, the court noted, plaintiff admitted that it defaulted on the loan, that FSL paid a claim made by plaintiff's lender, and plaintiff never attempted to redeem the property but yet refused to deliver the deed to the property as required under the IC Agreement. The Calhoun Circuit trial court concluded that defendants were entitled to summary disposition under MCR 2.116(C)(10). Thereafter, on July 26, 2022, the Calhoun Circuit trial court issued an order granting defendants' motion for summary disposition of the RA2 Battle Creek plaintiff's complaint for the reasons stated in defendants' motion for summary disposition, defendants' reply brief, and the opinions and orders of the Oakland Circuit trial court.

These appeals followed. The RA2 Troy plaintiff filed its claim of appeal on July 1, 2022. The RA2 Battle Creek plaintiff filed its claim of appeal on August 15, 2022. On September 21, 2022, this Court granted a motion to consolidate these matters. See *RA2 Troy, LLC v FI 135 Troy, LLC*, unpublished order of the Court of Appeals, entered September 21, 2022 (Docket Nos. 362023, 362572).

Plaintiffs argue on appeal that the trial court erred in concluding that the IC Agreements do not violate the rule against clogging a borrower's right of redemption. Further, plaintiffs argue, the trial courts erred in concluding that FSL's payment to the lender did not satisfy the loans. We consider each argument in turn, and conclude that they are without merit.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND APPLICABLE LAW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020) (citation omitted). A motion for summary disposition under MCR 2.116(C)(10) tests the factual support for a claim.

*Stone v Auto-Owners Ins Co*, 307 Mich App 169, 173; 858 NW2d 765 (2014) (citation omitted). The pleadings, affidavits, depositions, and other documentary evidence is reviewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). If reasonable minds could differ on an issue, a genuine issue of material fact exists. *Id*. (citation omitted).

We also review de novo issues of contract interpretation. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). Principles of contract interpretation are well established. The goal of contract interpretation is to honor the parties' intent and to enforce the contract's plain terms. *Davis v LaFontaine Motors, Inc*, 271 Mich App 68, 73; 719 NW2d 890 (2006). The contract is read as a whole and meaning given to all of its terms. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 50 n 11; 664 NW2d 776 (2003). That is, every word, phase, and clause must be given effect. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) (citation omitted). If no reasonable person could dispute the meaning of the contract's plain language, this Court must enforce that plain language as written. *Rory*, 473 Mich at 468. As our Supreme Court explained in *Rory*:

> A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written.* Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract. This Court has previously noted that the general rule of contracts is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts. [*Id*. at 468 (internal quotation marks, alterations, and citations omitted).]

## B. INSURED COVENANT (IC) AGREEMENTS

The IC Agreements do not violate the rule against clogging a borrower's right of redemption. The IC Agreements are insurance contracts that were entered into between plaintiffs, as owners, and FSL, the issuer of the RVI Policies, *after* plaintiff obtained loans secured by mortgages from PW Real Estate. The IC Agreements in both cases are substantially the same and provide, in relevant part:

> 2. Procedures Under the Policy.
>
> * * *
>
> (c) If Owner fails to pay in full on the Termination Date all amounts due and payable under the Note and the Mortgage, FSL will make payment in full to Additional Named Insured pursuant to Article I and V [of] the Policy and the Additional Named Insured Endorsement and title to the Property will be delivered to FSL in accordance with Section 4 hereof.
>
> * * *

4. Transfer of Title.

(a) In the event that FSL makes payment for a Claim under Articles I and V of the [RVI] Policy, the Owner shall cause the deed to the Property to be immediately delivered to FSL, without payment of additional consideration by FSL. Owner hereby acknowledges that payment by FSL under the Policy is the equivalent of a purchase of the Property by FSL for an amount equal to the amount paid under the Policy and used in satisfying all or part of Owner's obligations under the Note, and that such payment constitutes full and fair consideration for the transfer of title to the Property to FSL.

* * *

5. Representations, Warranties and Covenants of Owner.

Owner hereby certifies, represents, warrants and covenants to FSL, as of the date hereof and the date of issuance of the Policy, as follows:

* * *

(i) Owner has received the advice of counsel concerning each and all of the terms, conditions, limitations and exclusions of the Policy.

On appeal, plaintiffs argue that the IC Agreements violate the rule against clogging a borrower's right of redemption that is inherent in every mortgage loan transaction; thus, they are not enforceable. This Court in *Blackwell Ford, Inc v Calhoun*, 219 Mich App 203, 208-209; 555 NW2d 856 (1996) provided some pertinent historical background on this "clogging" issue:

As stated in *Humble Oil & Refining Co v Doerr*, 123 NJ Super 530, 544; 303 A2d 898 (1973), "[f]or centuries it has been the rule that a mortgagor's equity of redemption cannot be clogged and that he cannot, as a part of the original mortgage transaction, cut off or surrender his right to redeem. Any agreement which does so is void and unenforcible [sic] as against public policy." "A clog or restraint on the equity of redemption denotes 'any provision inserted to prevent a redemption on payment or performance of the debt or obligation for which the security was given.'" *Coursey v Fairchild*, 436 P2d 35, 39 (Okla, 1967), quoting Wyman, *The Clog on the Equity of Redemption*, 21 HarvLR 459, 472 (1908). To quote at length from Michigan's leading case on the matter, *Batty v Snook*, 5 Mich 231, 239-240 (1858):

Equity is jealous of all contracts between mortgagor and mortgagee, by which the equity of redemption is to be shortened or cut off. The mortgagor may release the equity of redemption to the mortgagee for a good and valuable consideration, when done voluntarily, and there is no fraud, and no undue influence brought to bear upon him for that purpose by the creditor. But it cannot be done by a contemporaneous or subsequent executory contract, by which the equity of redemption is to be forfeited if the mortgage debt is not

-8-

paid on the day stated in such contract, without an abandonment by the court of those equitable principles it has ever acted on in relieving against penalties and forfeitures.

In short, a mortgagor may not, at the time the mortgage is created, surrender his equitable right to redeem the property following a default.

On appeal, plaintiffs acknowledge that this remains the relevant, applicable law and yet argue that the IC Agreements at issue are not enforceable. Plaintiffs argument fails. FSL was *not* the mortgagee (or lender) and the IC Agreements were separate, distinct insurance contracts entered into days after plaintiff obtained loans secured by mortgages from PW Real Estate. As the trial courts concluded—the "clogging" doctrine only applies to contracts between a mortgagor and mortgagee. That is so because the equity of redemption is a characteristic of the mortgage. See *Russo v Wolbers*, 116 Mich App 327, 338; 323 NW2d 385 (1982). Plaintiffs have failed to refer us to case law from this jurisdiction or any other jurisdiction that supports its apparent claim that a mortgagor does not enjoy the freedom to contract in any way it chooses with another business entity—including an insurer—where the mortgaged property is involved. While plaintiffs have argued on appeal that PW Real Estate and FSL are related business entities, that claim is unsupported by any evidence.

But even if they were related business entities, as the Oakland Circuit trial court noted, a "mortgagor may [] sell and convey its equity of redemption to the mortgagee in a contract that is separate and distinct from the mortgage agreement and entered into in good faith for good consideration." *Oakland Hills Dev Corp v Lueders Drainage Dist*, 212 Mich App 284, 295; 537 NW2d 258 (1995). As the Calhoun Circuit trial court noted, plaintiffs were sophisticated business entities which certified and warranted that they entered into the IC Agreements after seeking the advice of legal counsel. It is a well-established principle of "contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written . . . ." *Burkhardt v Bailey*, 260 Mich App 636, 657; 680 NW2d 453 (2004) (quotation marks and citation omitted). Likewise, our Supreme Court has stated that "competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (quotation marks and citation omitted). Clearly, if plaintiffs were adverse to the terms required by the lender and insurer, plaintiffs could have sought financing for their commercial real estate purchases elsewhere. Accordingly, for the reasons articulated by the Oakland Circuit and Calhoun Circuit trial courts, defendants' motions for summary disposition of plaintiffs' claims in this regard were properly granted.

## C. RVI POLICIES

FSL's payments of the lender's claims made following plaintiffs' default did not discharge plaintiffs' obligations under the loan documents. The RVI Policies are insurance contracts that were entered into by plaintiffs, as the Named Insureds, and FSL, the issuer of the RVI Policies, after plaintiffs obtained loans secured by mortgages from PW Real Estate, which was named as an Additional Named Insured on the RVI Policies. The RVI Policies in both cases are substantially the same and provide, in relevant part, that in consideration of the payment of the premiums, FSL

agreed with the Insureds and the Additional Named Insured that, in the event of receipt of a notice of claim from the Additional Named Insured, FSL would pay to the Additional Named Insured the amount of the Insured Values, subject to the terms and conditions of the RVI Policies.

More specifically, Article V of the RVI Policies provided, in pertinent part:

## V. PAYMENT OF INSURED VALUE

(a) The Company [FSL] will pay to the Additional Named Insured [PW Real Estate] an amount equal to the Insured Value, if:

(i) a valid Notice of Claim has been given;

(ii) the Additional Named Insured shall not have received payment in full of all amounts owing under the Loan; and

(iii) all of the terms and conditions of this Policy have been satisfied.

The Company's obligations hereunder are limited to making payment to the Additional Named Insured in accordance with the terms hereof and the Additional Named Insured Endorsement, or, at the Company's option, in accordance with paragraph (V)(d) below, and the Company shall have no liability to the Insured except to make payment to the Additional Named Insured in accordance with this Policy. In no event will the Insured have any ownership interest or other rights with respect to the proceeds of this Policy.

\* \* \*

(d) In the event that the Company is obligated in accordance with the terms and conditions of this Policy to make payment to the Additional Named Insured, on the Termination Date (and at any time thereafter) the Company shall have the option in its sole discretion, in lieu of complying with Article I and Article V of the Policy, to purchase the Loan from the Additional Named Insured for a purchase price equal to all amounts payable under the Loan, but in no event greater than the Insured Value. The Company may exercise such option by giving written notice to the Insured and the Additional Named Insured and making payment of the purchase price to the Additional Named Insured within the time provided in Article V(c) hereof. If the Company exercises such option, the Additional Named Insured will assign the Loan and all documents evidencing or securing the Loan to the Company, without recourse, in accordance with the provisions of Section 8 of the Additional Named Insured Endorsement. Upon completion of such transfer and payment by the Company as provided herein, any and all liability of the Company under the Policy shall terminate. In any event, if the Loan is not outstanding on the Termination Date, any and all liability of the Company under the Policy shall terminate.

Similarly, the Additional Named Insured Endorsement provided, in Paragraph 8, as follows, in relevant part:

> 8. Assignment of Loan Documents in Accordance With Requirements of Policy.
>
> Upon the payment by the Company [FSL] of the Insured Value pursuant hereto, the Additional Named Insured [PW Real Estate] agrees to promptly assign to the Company (or its designee), without recourse, the Note, the Mortgage and all other documents relating to the Loan ("Loan Documents", including without limitation the rights of the Additional Named Insured under any mortgagee title insurance policies, to the extent assignable) . . . .

Plaintiffs argue on appeal, as they did in the trial courts, that FSL's payment to PW Real Estate of the Insured Values of their respective properties after plaintiffs defaulted on their loans actually satisfied plaintiffs' loans and plaintiffs were no longer liable for any outstanding balances on those loans. In other words, plaintiffs' owned the properties free and clear of any loans and FSL acquired no rights that interfered with plaintiffs' ownership rights with respect to those properties. As the trial courts noted, plaintiffs' arguments are obviously not consistent with the plain and unambiguous language of the RVI Policies and Additional Named Insured Endorsements.

The RVI Policies do not state that FSL's payment to PW Real Estate of the Insured Values of the properties would satisfy plaintiffs' financial obligations under the loans. Plaintiffs have failed to cite to any provisions that support such an argument. In fact, Article 5(a) actually states that, in no event, will plaintiffs "have any ownership interest or other rights with respect to the proceeds of this Policy." In other words, plaintiffs were not intended to benefit from the RVI Policies by having their loans declared or deemed satisfied or retired. This conclusion is supported by the facts that (1) the "Insured Value" of RA2 Troy's property was $1,785.457 and the premium it paid for the policy was only $74,418; and (2) the "Insured Value" of RA2 Battle Creek's property was $941,741 and the premium it paid for the policy was only $40,670. Further, according to Paragraph 8 of the Additional Named Insured Endorsement, the Additional Named Insured (PW Real Estate) was to promptly assign the loan documents to FSL upon payment of the Insured Values—clearly evincing the intention of the parties that plaintiffs' financial obligations under the loans remained unsatisfied after FSL paid claims for the "Insured Values" of the properties.

Plaintiffs further argue that the IC Agreements—although unenforceable—support their claims that the payments by FSL of the "Insured Values" satisfied their loans. Plaintiffs refer us to the following provisions of the IC Agreements:

> 2. Procedures Under the Policy.
>
> * * *
>
> (c) If Owner fails to pay in full on the Termination Date all amounts due and payable under the Note and the Mortgage, FSL will make payment in full to Additional Named Insured pursuant to Article I and V [of] the Policy and the Additional Named Insured Endorsement and title to the Property will be delivered to FSL in accordance with Section 4 hereof.

* * *

4.      Transfer of Title.

(a) In the event that FSL makes payment for a Claim under Articles I and V of the [RVI] Policy, the Owner shall cause the deed to the Property to be immediately delivered to FSL, without payment of additional consideration by FSL. Owner hereby acknowledges that payment by FSL under the Policy is the equivalent of a purchase of the Property by FSL for an amount equal to the amount paid under the Policy and used in satisfying all or part of Owner's obligations under the Note, and that such payment constitutes full and fair consideration for the transfer of title to the Property to FSL.

Plaintiffs argue that these two provisions prove that the payment of the insurance proceeds satisfied their loans. But neither provision states that plaintiffs' loans were satisfied if FSL paid such claims under the RVI Policies. Both of these provisions clearly state that, upon FSL's payment of claims made by the Additional Named Insured, the titles or deeds to the real properties that were subject to the loan documents were to be immediately delivered to FSL. According to defendants, that did not happen in this case despite FSL's payment of the claims.

Finally, plaintiffs argue that they are not bound by the Additional Named Insured Endorsements—in particular, Paragraph 8 which assigned the loan documents to FSL—because the Endorsements "were intended to implement and supplement the provisions of the RVI Policies that are binding as between only the lender and FSL." However, the RVI Policies specifically state that in consideration of the payment of the premiums, FSL agreed with "the Insured and the Additional Named Insured" that:

In the event of receipt of a Notice of Claim from the Additional Named Insured, and subject to the terms and conditions hereof, the Company [FSL] shall pay to the Additional Named Insured the amount of the Insured Value, subject to the terms and the conditions, exclusions and limitations of this Policy, determined as of the Termination Date.

And the term "Policy" was defined in Article II, Paragraph 27 as

this Residual Value Insurance Policy, the Application and the Declarations, the Additional Named Insured Endorsement and any and all other endorsements hereto or thereto.

As the Oakland Circuit trial court held, the Additional Named Insured Endorsement is considered part of the insurance policy under which plaintiffs are the named insureds, and thus, plaintiffs' argument that they are not bound by the terms of the Endorsement is without merit. Accordingly, for the reasons articulated by the Oakland Circuit and Calhoun Circuit trial courts, defendants' motions for summary disposition of plaintiffs' claims in this regard were properly granted.

In summary, defendants' motions for summary disposition were properly granted in both cases and plaintiffs' complaints were properly dismissed.

-12-

Affirmed.  Defendants are entitled to costs as the prevailing parties.  MCR 7.219(A).


/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Anica Letica